IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KIMBERLEY ARNOLD,                                          Civ. No. 3:10-cv-1025-AC

                                    Plaintiff,              OPINION AND
                                                                 ORDER
              v.

PFIZER, INC.,

                                    Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Kimberly Arnold ("Arnold") brings this employment lawsuit against defendant

Pfizer, Inc. ("Pfizer") arising from a prior employment relationship.  Arnold alleges claims of

discrimination and retaliation under Title I of the Americans with Disabilities Act ("the ADA"), 42

U.S.C. § 12101, *et seq*.; discrimination and retaliation under the Oregon Rehabilitation Act, Oregon

Revised Statutes ("ORS") 659A.100, *et seq*.; retaliation for filing a workers compensation claim,

OPINION AND ORDER                              1                                       {KPR}

in violation of ORS 659A.040; violation of the Family and Medical Leave Act ("the FMLA"), 29 U.S.C. § 2601, *et seq.*, and wrongful termination. Pfizer moves for summary judgment on all claims. For the reasons below stated, Pfizer's motion is granted as to Arnold's Oregon Rehabiliation Act retaliation, workers compensation retaliation, and wrongful termination claims. The motion is denied as to Arnold's ADA discrimination and retaliation, Oregon Rehabilitation Act discrimination, and FMLA claims.

*Factual Background*

Arnold began working at Pfizer in 1996 as a sales representative. (Jatana Declaration ("Decl."), Exhibit ("Ex.") B at 17, 20.) Sales representatives "call on physicians, hospitals and other healthcare providers to explain the benefits of and to sell Pfizer's pharmaceutical products." (Jennings Decl. ¶ 5.) Sales representatives report to a district manager. *Id.* Arnold's employment with Pfizer was "at will." (Jatana Decl., Ex. B at 18.) Arnold's employment was also governed by the Prescription Drug Marketing Act ("PDMA"), of which she was aware and with which she knew she was obligated to comply. (Jatana Decl., Ex. B at 20.) Arnold was aware of Pfizer's policy of encouraging employees to register problems or complaints with management, or "anybody up the chain of command." (Jatana Decl., Ex. B at 26.) Arnold testified that she was aware of Pfizer policies and her obligation to comply with them, as well as those requirements set forth under the PDMA. (Jatana Decl., Ex. B at 28-44.)[1]

One of Arnold's duties as a sales representative was to furnish healthcare providers with samples of Pfizer products, a practice referred to as "sampling." (Jatana Decl., Ex. B at 29.) Starters

---

[1] Relevant Pfizer policy guides were filed under seal and can be found at Jatana Decl., Ex. B (#76).

OPINION AND ORDER                                    2                                    {KPR}

are samples given to physicians and their distribution must be documented.  (Jatana Decl., Ex. B at 29-30.)  Arnold was aware that she was requried to accurately document all starter activity by way of a Starter Activity Form ("SAF").  (Jatana Decl., Ex. C at 10-11.)  The SAFs state that starter activity should be entered and synchronized daily.  (Jatana Decl., Ex. C at 12.)  According to Arnold, during her eleven-year tenure with Pfizer in Oregon, "no Pfizer manager, supervisor, or official ever talked to [her] about the [SAFs] until May 27, 2009, a few weeks before [she] was terminated." (Arnold Decl. ¶ 9.)

In 1999, Arnold received a promotion to Specialty Healthcare Representative and was transferred to Portland.  (Jatana Decl., Ex. B at 21; Arnold Decl. ¶ 8.)  Arnold was promoted twice more by Pfizer, to Cardiovascular Specialty Healthcare Representative and Senior Cardiovascular Specialty Representative.  (Arnold Decl. ¶ 11-12.)  On September 1, 2005, Pfizer reorganized and laid off much of its workforce.  (Arnold Decl. ¶ 17.)  Arnold was not laid off but, in order to stay in Portland, she relinquished her position as a Specialty Healthcare Representative and took a position as a Primary Care Healthcare Representative.  (Jatana Decl., Ex. B at 21-22, 68; Arnold Decl. ¶ 17.)

Between 2001 and 2005, Arnold went on medical leave three times.  The first was following her pregnancy, the second for surgery to remove her gallbladder, and the third after she broke her foot.  (Arnold Decl. ¶ 18.)  Each time, Arnold was returned to the same position and the same rate of pay she enjoyed prior to going on medical leave.  (Jatana Decl., Ex. D at 8-11, 14-15.)[2]

On September 16, 2005, Arnold was driving on the job when she was hit by a FedEx delivery

---

[2] Arnold's confidential medical records are filed under seal as Exhibit T to the Jatana Declaration (#78).

truck. (Jatana Decl., Ex. B at 68.) Arnold subsequently sued FedEx for negligence. (See Complaint, Jatana Decl. Ex. B at 81-83.) Around the same time, Arnold again went on medical leave, or short-term disability, as the result of injuries sustained in the accident. (Arnold Decl., Exs. 4, 5.) Dr. Agatha Nody ("Dr. Nody") and Nurse Jenny Mark ("Nurse Mark"), with Pfizer, are responsible for approving short-term disability and scheduling independent medical examinations ("IME"). (Jatana Decl., Ex. B at 52.)

Arnold informed Pfizer that she was ready to return to work in early 2006. On March 1, 2006, Dr. Nody wrote to Arnold, informing her that although Pfizer had received her "Return to Work Status form," she was required to undergo an IME to ensure her readiness to return to work. The letter advised Arnold that she would be contacted by a third party, Unival, about scheduling the IME. (Arnold Decl., Ex. 6.) The examination was subsequently scheduled for March 16, 2008, with Dr. Thomas P. Anderson, M.D. ("Dr. Anderson"). (Arnold Decl., Ex. 7 at 1.) The day before, March 15, 2006, Arnold underwent a "Functional Capacity Evaluation" ("FCE"), administered by Healthsouth Mountain View and physician Jeff Gerry, M.D. ("Dr. Gerry"). Dr. Gerry deemed Arnold fit to perform light work, leaving her able to lift twenty pounds occasionally and ten pounds frequently. (Arnold Decl., Ex. 8 at 1.)

Arnold was not cleared to work by the March 16, 2006, IME. (Arnold Decl. Ex. 10.) In an April 16, 2006, email to Carol Crane ("Crane"), Arnold stated that she wished to return to work full time, would attempt to schedule another IME, and was concerned that her position had been posted on Pfizer's website. (Arnold Decl. Ex. 10.) The next day she emailed Dr. Nody and Nurse Mark, expressing her desire to schedule another IME in light of her improved condition. (Arnold Decl. Ex. 11.) A letter from Dr. Nody stated that Arnold's short-term disability benefits would exhaust on

March 17, 2006. (Arnold Decl. Ex. 9.)

On April 26, 2006, Arnold underwent another IME, conducted by Dr. Edward Grossenbacher ("Dr. Grossenbacher"), wherein Arnold was found capable of operating a motor vehicle, lifting up to twenty-five pounds, and returning to her position at Pfizer. (Arnold Decl. Ex. 14.)

Arnold again took leave, between October 31, 2006, and the end of June 2007, for cervical spine surgery, the result of her motor vehicle accident with FedEx. (Arnold Decl., Ex. 15 at 1; Jatana Decl., Ex. D at 32.) Arnold was approved for short-term disability benefits from November 6, 2006, through December 15, 2006. (Arnold Decl., Ex. 15 at 1.) She applied for long-term disability, which request was denied. While still on short-term disability leave, Arnold noticed that her position had been posted online as an available position at Pfizer. In a February 27, 2007, email sent to Dr. Nody and Nurse Mark, Arnold stated she was ready to return to work on April 1, 2007, and asked if she needed another IME. Dr. Nody responded that an updated IME was required and that she would "proceed to schedule the IME." (Arnold Decl. Ex. 16.) On April 16, 2007, Arnold was released for "modified work" by Dr. Anderson beginning on April 30, 2007. (Arnold Decl. Ex. 17.)

Pfizer informed Arnold she would have to "undergo a Fitness for Duty (FFD) examination" prior to her return and extended Arnold's short-term disability benefits through May 6, 2007. (Arnold Decl., Ex. 18.) Arnold emailed Crane, stating that she wanted to return to work and was concerned about her position being posted in the meantime. (Arnold Decl. Ex. 19.) In a May 4, 2007, letter, Dr. Nody informed Arnold that she would need to obtain an FFD evaluation, including an FCE, prior to returning to work. Arnold testified that Pfizer put off scheduling an IME until after her short-term disability ran out. (Jatana Decl., Ex. D at 40.)

On May 29, 2007, Julie Jennings ("Jennings"), Senior Manager of Human Resources at Pfizer, notified Arnold by letter that her short-term disability had exhausted as of May 6, 2007, and that Pfizer policy permitted it to reassign Arnold "to a Regional Representative territory in [her] current district" and to "fill [her] vacant territory." (Arnold Decl. Ex. 21.) On June 4, 2007, Arnold emailed to Jennings in response, arguing that she had complied with all of Pfizer's requirements, but that Pfizer personnel unreasonably delayed scheduling the examinations that would permit her to return to work. (Arnold Decl., Ex. 25.) This prompted a series of emails amongst Pfizer personnel regarding whether there had, in fact, been a delay in scheduling the necessary tests and whether Arnold's position should continue to be posted online. (Arnold Decl. Ex. 24.) The consensus was that the posting should be taken down. *Id*. Arnold's email also prompted Jennings to forward the exchange to Crane, stating: "Carol, please file and keep record of this. I think we[]should maintain electronic or paper files once a[]disability starts down this type of road." (Arnold Decl. Ex. 28.)

On June 8, 2007, Arnold's FCE issued, stating that she could return to work, but limiting her to lifting twenty pounds occasionally and ten pounds frequently. (Arnold Decl., Ex. 27 at 1.) On June 18, 2007, Arnold's IME took place and Dr. Grossenbacher cleared Arnold to work with light duty restrictions. (Arnold Decl., Ex. 31at 1, 4.) Pfizer was in receipt of the IME by at least June 21, 2007, and Arnold was back to work by the end of the month. (Arnold Decl. Ex. 32, 34.) Arnold's 2007 performance review was largely positive. (Arnold Decl., Ex. 37.)

After returning to Pfizer in June 2007, Arnold discussed with her supervisor, Mark Johnson ("Johnson"), that she was subject to a lifting restriction by her doctor, and was still in pain, particularly when she had to bend down to pick something up. Johnson suggested that she request

a van with a "lift back" as an accommodation from Pfizer to minimize her need for bending over. (Jatana Decl., Ex. B at 54-55.) On February 6, 2008, Arnold requested the accommodation from Dr. Nody at Pfizer. (Jatana Decl., Ex. D at 57.) Dr. Nody asked to see Arnold's medical file from her pain specialist, Dr. Andrew Chiu ("Dr. Chiu"), to determine whether the accommodation was necessary. (Jatana Decl., Ex. B at 55.) Arnold complied and, approximately one month later, Dr. Nody contacted Arnold and said that Arnold's chart notes indicated that she was on medication that would impair her driving. *Id*. Dr. Nody stated that Arnold should not be out working in the field and should be on short-term disability. (Jatana Decl., Ex. B at 56.) Dr. Nody also contacted Arnold's pain specialist, Dr. Chiu, to inform him of same. *Id*.

Arnold wanted to continue working, however, and worked with Dr. Chiu to get on an appropriate pain medication that would permit her to continue driving. (Jatana Decl., Ex. B at 55-56.) Dr. Nody voiced another objection to the new medication and Arnold again contacted Dr. Chiu to address that further concern. (Jatana Decl., Ex. B at 56-57.) Throughout this process, Arnold was in contact with Johnson who assured her that everything would be okay. She informed Johnson about her contact with Dr. Nody and how upset she was that Dr. Nody was pressuring her to go on short-term disability or to quit working for Pfizer altogether. (Jatana Decl., Ex. B at 57; Ex. D at 30.) Dr. Chiu informed Pfizer that he had prescribed Arnold a pain medication, Ultram, to be taken only once daily, at night. (Arnold Decl. Ex. 48.) On April 17, 2008, Dr. Nody cleared Arnold to drive. (Arnold Decl. Ex. 49.)

Shortly thereafter, on April 30, 2008, Dr. Nody approved Arnold's accommodation request, deeming it a "qualifying condition under the ADA[.]" (Arnold Decl. Ex. 50.) However, by August 3, 2008, Arnold still had not received the vehicular accommodation. She queried Johnson as to the

delay, and he forwarded her inquiry to Andrew Powell ("Powell") in human resources. (Arnold Decl. Exs. 51, 52.)

Throughout her tenure with Pfizer in Oregon, Arnold had five district managers: Lisa Ness, Leslie Fox, Gerald Bringhurst, Mark Johnson, and Darcy Small. Johnson was Arnold's district manager from early 2007 until January 30, 2009, at which time Small took over as district manager. (Jatana Decl., Ex. B at 24.) In his experience with Arnold, he believed that she had good rapport with physicians and he never questioned the service she was providing or her honesty in representing that service. (McCool Decl., Ex. A at 8.) Johnson testified that he was never concerned about the amount of pain medication Arnold was taking, with respect to both her job performance and her ability to drive. (McCool Decl., Ex. A at 19.) In January 2009, extensive layoffs took place at Pfizer. (Jatana Decl., Ex. C at 19.) Out of fifteen to twenty representatives in Portland, Arnold was one of approximately five representatives that was not laid off. *Id*. Johnson testified that Arnold was not laid off, in his opinion, because she was capable. (McCool Decl., Ex. A at 23.)

Arnold first met Small in person at a February 11, 2009, meeting. In the course of the lengthy meeting, Arnold needed to periodically stand to relieve her back pain. (Arnold Decl. ¶ 115.) According to Arnold, Small was offended by this and questioned her about it after the meeting. *Id*. Arnold told Small about the accident involving the Fed Ex truck and informed her that she was injured and would likely need surgery in the coming year. (Jatana Decl., Ex. D at 24.) Later, at a work-related dinner, Arnold told Lonnie Lucherini ("Lucherini"), Regional Manager for Northwest Region at Pfizer, about the accident, her injuries, and future need for surgery; Small was present and privy to this conversation. (Jatana Decl., Ex. E at 6.)

Toward the end of February 2009, Small contacted Lucherini with concerns about some of Arnold's behaviors. (Jatana Decl., Ex. H at 7-8.) Small was concerned because of a series of events: Arnold failed to return Small's first phone call as her supervisor in a timely fashion, arrived late for their first district meeting, asked to leave that same meeting early, and missed a scheduled one-on-one meeting with Small. (Jatana Decl., Ex. H at 7-12.) Small was also troubled by a sense she got during a meeting with Arnold's coworker Rahimi. This concern was based on a comment or gesture made by Rahimi that made Small think "something's not right here." (McCool Decl., Ex. F at 14.)

In response to her concerns, Lucherini recommended that Small contact Jennings, in Human Resources, and Jennings in turn recommended that Small investigate Arnold's "work activity." (Jatana Decl., Ex. H at 15; Jennings Decl. ¶ 1.) Jennings also suggested Small talk to Johnson, Arnold's most recent supervisor. (Jatana Decl., Ex. H at 16.) Following these conversations, Small planned to look at the number of calls Arnold made each day and whether she left samples at those locations. (Jatana Decl., Ex. H at 20.) Small subsequently requested a starter activity report from Jennings, and then determined that she needed more information regarding Arnold's work activity. (Jatana Decl., Ex. H at 24-25.) Small testified that, other than "compliance violation[s]" she had no concerns about Arnold. (McCool Decl., Ex. F at 20.) Small testified that she did not look into the starter activity of any representatives other than Arnold, except in comparison to determine if Arnold's forms were truthful. (McCool Decl., Ex. E at 27.)

On March 18, 2009, Small forwarded an email regarding a sampling inquiry from Dr. Graham's office to Arnold and Rahimi, and Arnold replied that she had sampled the office the previous day. (Arnold Decl. Ex. 67.) On April 14, 2009, Small followed up with Arnold and

Rahimi regarding the prior inquiry. (Arnold Decl. Ex. 70.) Arnold responded via email later that day that she had sampled Dr. Graham three times since the request. (Jatana Decl., Ex. H at 39.) On April 26, 2009, Arnold emailed Small indicating she was out of Lipitor and Small responded that Arnold's Lipitor samples were shipped to her on April 18, 2009. (Arnold Decl. Exs. 74, 75.)

On May 5, 2009, Small emailed Arnold, stating that a report submitted by Arnold "look[ed] good." (Arnold Decl. Ex. 76.) On May 11, 2009, Arnold emailed Small that she was out sick and Small's response did not suggest that there was a problem. (Arnold Decl. Ex. 77.)

On May 13, 2009, Small accompanied Arnold for a half day "ride along," to observe Arnold working in the field. (Arnold Decl. ¶ 153.) In the course of the ride along, Small asked Arnold how much money she was seeking in her settlement discussions with FedEx, to which Arnold laughingly answered that she was seeking "$4 million, in my dreams." (Jatana Decl., Ex. B at 71.) Small also inquired about Arnold's injuries and Arnold told her she would need additional surgery in the future. (Jatana Decl., Ex. B at 72.) Arnold was upset by some of Small's questions that day about Arnold's injury and her lawsuit with FedEx. (Jatana Decl., Ex. B at 70.) Notably, during the same period of time, Small did not accompany Arnold's coworker Rahimi on a ride along. (McCool Decl., Ex. B at 9.)

On May 17, 2009, Small emailed Johnson about Arnold's vacation and sick leave trackers stating that she wanted to have her "bases covered[.]" (Arnold Decl. Ex. 80.) The information contained in Arnold's vacation trackers is the subject of dispute. (Arnold Decl. Ex. 86, 87.)

On May 27, 2009, Arnold met with Small and Lucherini. Arnold describes the meeting in her declaration. First, Arnold, Small, and Lucherini discussed the manner in which Arnold used starter activity pads. Arnold was specifically questioned about alleged discrepancies on two SAFs

and she was able to explain the legitimate cause of the discrepancy. Small repeatedly accused Arnold of trying to cover up a lack of work activity and attempted to get Arnold to confess to violations, but Arnold denied she had engaged in any misconduct. Small also questioned Arnold about absences beginning as early as 2006. Small was hostile and, toward the end of the meeting, Arnold became upset. Lucherini assured Arnold that the purpose of the meeting was to be clear about expectations and that he and Small would get back to her after they consulted with the legal department and Human Resources. (Arnold Decl. ¶¶ 157-173.)

At one point during this meeting, Arnold said "I'm so sorry. I know this looks bad. I would never mislead." (Jatana Decl., Ex. D at 22.) The parties dispute the meaning of this statement. According to Arnold, she was unprepared to explain her numerous absences and was unable to identify absences that were attributable to vacation or sick leave because she did not have access to her leave trackers. Flustered, she apologized for the appearance of numerous absences and her inability to explain them. (Jatana Decl., Ex. D at 22-23.) Arnold also admitted at the meeting that she was not an organized person. (Jatana Decl., Ex. D at 23.)

Around the same time as Arnold's meeting with Small and Lucherini, Pfizer initiated an investigation of Arnold's starter activity. James Batura ("Batura"), Director of PDMA Compliance, conducted this investigation. (Jatana Decl., Ex. G at 5.) Batura characterized Pfizer's policy as follows:

> Starter Administration Forms ("SAFs") are sequentially numbered forms used to record the transfer of starters by representatives to licensed prescribers. The forms are bound in pads containing 25 forms per pad. SAFs are ordered by control number. . . . Pfizer must make all starter forms available to the U.S. Federal Drug Administration ("FDA") and starter forms are considered by the FDA to be the controlling record of a starter transaction.
> Pfizer's Starter Administration Policy requires sales representatives to input an electronic record of each starter transaction they have with a physician into a

secure electronic database called Sherlock.  At the end of each sales day, a sales representative is required to log onto Sherlock and "synch" his or her starter activity report with the Sherlock host computer by logging onto a secure network and uploading the electronic records of the day's starter activity.

(Batura Decl. ¶¶ 4-5.)

Batura reviewed Arnold's starter activity between January 2, 2008, and April 10, 2009. (Jatana Decl., Ex. G at 8.)  In this investigation, Batura looked at whether Arnold's SAFs were used in sequential order, whether transactions from a single day were entered over two or more days, whether transactions were entered electronically but not backed up by hard copies, and the length of time between transaction and electronic entry.  (Jatana Decl., Ex. G at 10-24.)  On May 12, 2009, the results of Batura's SAF analysis were circulated via email from Jennings to Small and Lucherini. (Arnold Decl. Ex. 78.)

At deposition, Batura testified that his impression of Arnold's starter activity was that it represented "very serious" noncompliance.  (Jatana Decl., Ex. G at 35.)  Batura also testified that his conclusions regarding the percentage of non-consecutive SAFs were based on his own observations, and not a scientific basis.  (McCool Decl., Ex. K at 12.)  Batura gave significance to whether Arnold initialed the changes she made to SAFs because the act of initialing would indicate that the mistake was honest and the alteration a correction of said mistake.  (Jatana Decl., Ex. G at 38-39.)  Batura admitted that, in reporting Arnold's starter activity to the FDA, Pfizer did not state that Arnold had not called on physicians on the dates recorded on the starter forms, though Pfizer did state that there were reporting discrepancies.  (Jatana Decl., Ex. G at 46-47.)  Batura also admitted that there was not "anything definitive on that form that would confirm that she didn't see those providers on those days." (McCool Decl., Ex. K at 34.)  Jennings testified that using SAFs out-of-order was not prohibited and also that waiting for a physician to appear in Pfizer's database

would be appropriate before completing the SAF.  (McCool Decl., Ex. G at 21-23, 25.)

Notably, after Arnold's termination, Batura sent an email to Jennings on June 18, 2009, in which he wrote:  "Had the audit we conducted of the forms Kimberly Arnold submitted for the five doctors about whom Darcy Small had concerns produced anything actionable I would have been in touch sooner."  (Arnold Decl. Ex. 90.)   He went on to explain that, of the five doctors contacted, four confirmed their signatures and one failed to respond completely.  *Id.*  Furthermore, Batura agreed that Arnold had been trained to fill out starter forms in advance of seeing a doctor, which would at times require a change to the date where sampling did not go as planned, a permitted practice.  (McCool Decl., Ex. K at 38-40.)  He also admitted, at deposition, that a post-termination audit of Arnold's starter activity "did reconcile successfully."  (McCool Decl., Ex. K at 16.)  Batura further admitted that health care representatives have logged longer delays in entering an SAF but were not terminated.  (McCool Decl., Ex. K at 17-18.)  Batura did not make a recommendation as to whether Arnold should be terminated for the alleged discrepancies in her starter activity forms. (Jatana Decl., Ex. G at 48.)  Jennings also admitted that Pfizer did not contact any of the physicians to determine whether they had, in fact, been sampled on the dates Arnold claimed she had sampled them.  (Jennings Decl., Ex. G at 24.)

Following the May 27, 2009, meeting with Small and Lucherini, Arnold set up an appointment for June 1, 2009, with Dr. Sue A. Lewis ("Dr. Lewis"), who determined that Arnold suffered from Attention Deficit Disorder ("ADD").  (Jatana Decl., Ex. C at 15-17.)  Dr. Lewis deemed the condition the cause of Arnold's inconsistent conduct with respect to documenting starter activity and prescribed medication to manage the condition.  (Jatana Decl., Ex. C at 16.)  On June 2, 2009, Arnold informed Lucherini, via email, that she had been diagnosed with an additional

condition that may have affected her ability to complete starter activity with total accuracy.  (Jatana Decl., Ex. C at 16, 37.)  He told her to call Jennings and report the new diagnosis.  Arnold did so, at which time Jennings told her to get a letter from her doctor and give it to Dr. Nody.  Jennings also reassured Arnold about the stater activity dispute, stating that she would likely be warned verbally or in writing, and that only rarely did such disputes result in termination.  (Jatana Decl., Ex. D at 26; Jatana Decl., Ex. E at 5.)

On June 8, 2009, Dr. Lewis faxed a letter to Dr. Nody at Pfizer Employee Health stating that she had recently diagnosed Arnold with ADD and started her on medication.  Dr. Lewis wrote:  "It is my medical opinion that Kimberly Arnold's condition has hindered her ability to perform some of her job responsibilities and consequently has hindered her ability to perform some of her overall job performance.  I believe that with treatment, her performance should improve."  (Jatana Decl., Ex. R at 2.)

Jennings testified that the decision to terminate Arnold was made prior to Arnold's disclosure to Lucherini of the ADD diagnosis.  (Jatana Decl., Ex. E at 14.)  She explained:  "So we made a decision on Kimberly Arnold's employment based on the facts that arose from the investigation.  And because we had not yet communicated the outcome to her, and she brought this issue forward to Lonnie Lucherini, certainly there needed to be due diligence accorded to see if in fact the medical information that her physician provided to our medical department would have reason to change the decision that all parties agreed to."  (Jatana Decl., Ex. E at 15.)  At that point, Pfizer determined that the new information did not alter its plan to terminate Arnold.  (Jatana Decl., Ex. E at 16.)  According to Jennings, Small and Lucherini made the final decision to terminate Arnold, which decision Jennings supported.  (Jatana Decl., Ex. E at 19.)  Jennings later testified that the decision-

makers were Lucherini and Michelle Wickwire.  (Jatana Decl., Ex. E at 32.)

On June 25, 2009, Batura wrote a letter to the FDA regarding Arnold's starter activity and compliance with the PDMA.  He first described the irregularities he observed in Arnold's starter activity reporting.  He wrote:  "In a subsequent interview with her District and Regional Sales Managers, Ms. Arnold admitted to changing the dates on some of her forms and mis-recording those on others in order to conceal a lack of work activity on those days."  (Batura Decl., Ex. A.)[3]  He stated in conclusion, however, that Arnold's last two annual inventories had been in compliance with the PDMA and, "[b]ased on the information gathered in the course of our investigation, we do not have any reason to suspect that any of the samples issued to her were used for other than their intended purposes."  *Id*.

On July 9, 2009, Arnold and her attorney at the time, Steve Piucci, exchanged emails.  Arnold reported to Piucci that she had spoken with her doctor:  "He thinks that my termination is [the] result of my accident.  I was not able to give work my all because of my pain problem and all the drugs I'm on."  (Jatana Decl., Ex. N.)  The parties dispute the meaning of this statement.  Pfizer contends that it is an admission that Arnold was not qualified to perform her essential job duties.  Arnold argues that she was merely repeating her doctor's opinion to her attorney.  As discussed below, this evidence is ambiguous and a trier of fact must determine its meaning.

On September 18, 2009, Arnold authored a letter to the Bureau of Labor and Industries ("BOLI"), wherein she alleged that Pfizer was opposing her unemployment claim in retaliation for

---

[3] Pfizer filed this document under seal pursuant to this court's protective order (#19) entered on March 21, 2011.  For purposes of this disposition, the court modifies its prior order with respect to this exhibit, finding that the communications between Batura and the FDA are not entitled to protection as confidential or otherwise privileged.  Thus, to the extent it is referenced herein, the under seal designation is removed.

her refusal to agree to not sue Pfizer.  (Jatana Decl., Ex. C at 56.)  BOLI conducted an investigation

into Arnold's allegations and recommended that the complaint be dismissed because Arnold "failed

to show any significant connection between her workers' compensation claim/disabilities and

[Pfizer's] actions."  (Jatana Decl., Ex. C at 59.)

On March 19, 2010, Arnold filed a complaint with BOLI.  On her "Employment

Discrimination Questionnaire," she indicated that she had been subjected to discrimination based

on sex, gender, age, disability, and injured worker status. (Jatana Decl., Ex. C at 43.) She stated that

the first and last date of discrimination was June 17, 2009, and that she had been terminated without

warning for alleged violations of Pfizer's starter administration policies.  *Id.*  In an attachment to this

form, Arnold explained the bases for her allegations:  first, she stated that Pfizer fired her for a

technical violation, without process, because she is more than forty years old and in a high salary

bracket because of her experience; second, she stated that Pfizer knew of her recent ADD diagnosis

and that she had been prescribed medication to help her correct her starter activity errors, and

terminated her anyway; and, third, she stated that the injuries resulting from her motor vehicle

accident with FedEx gave rise to physical limitations and expensive medical bills that Pfizer sought

to avoid by terminating Arnold.  (Jatana Decl., Ex. C at 45-47.)  She was unable to identify any

comparators, but noted that the EEOC was investigating Pfizer for civil rights violations and that

she was one of many older employees who experienced similar treatment.  (Jatana Decl., Ex. C at

49.)

With respect to her injured worker complaint, Arnold reported that she had returned to the

same position she held before the accident involving the FedEx truck, and that Pfizer neither offered

her a light duty position nor placed her on OFLA leave.  She wrote:  "I had no choice but to go back

OPINION AND ORDER                          16                                {KPR}

full time or lose my job." (Jatana Decl., Ex. C at 51.)  With respect to her disability discrimination claim, she wrote that she could not perform essential functions of her job without accommodation, and that she had requested and received accommodation in the form of "a car with [an] automatic lift gate" to facilitate loading samples in her car for physician sampling.  (Jatana Decl., Ex. C at 54.) She also wrote that her disability limited her in her work life, in the following ways:  "With work, I had to rest or go home at times because of the pain.  It would require taking pain medications where I was unable to drive."  (Jatana Decl., Ex. B at 54.)

Arnold's coworkers testified about her condition. Coworker Nooshin Rahimi ("Rahimi") stated that she at times felt uneasy about riding with Arnold and would offer to drive to avoid being her passenger.  She also stated that she had observed Arnold experiencing medication side effects which caused Arnold to sweat and tremble.  (Janata Decl., Ex. I at 4, 8.)  After Arnold's surgery, however, she had observed Arnold effectively operating a vehicle and, generally, considered Arnold an effective Pfizer representative.  (McCool Decl., Ex. B at 7-8.)  Another coworker, Seaneed Rudkin-Manning ("Rudkin-Manning"), testified that she felt similar unease with respect to Arnold's physical condition, but that she never felt Arnold's physical condition would prevent her from performing her job at Pfizer.  (McCool Decl., Ex. E at 14.)

*Evidentiary Rulings*

Pfizer moves to strike the expert testimony of Michael D. Freeman ("Freeman") (#105), the Declaration of Olga Buchanan ("Buchanan") (#106), and portions of Arnold's declaration (#107). Arnold, in her response memorandum, moves to strike portions of the Jatana and Jennings declarations.  In its reply memorandum, Pfizer also objects to portions of the McCool declaration and an alleged failure by Arnold to comply with Local Rule 7-1(a).  These motions and objections

will be addressed in turn.

I.      Motion to Strike Testimony of Freeman

Pfizer argues that Freeman's expert opinion is neither qualified nor relevant to the subject matter of this case.  Arnold responds that Freeman is qualified to testify and his testimony is relevant to the question of whether Pfizer's termination of Arnold was lawful.

Federal Rule of Evidence ("FRE") 702 governs testimony by expert witnesses.  It provides, generally, that an expert may testify where his or her expert knowledge will assist the trier of fact, and is supported by facts, reliable methodology, and application of said methodology.  FED. R. EV. 702.  Under Supreme Court precedent, trial courts have an obligation to exercise a gatekeeping function with respect to the reliability of admitted expert testimony.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Expert testimony must assist the trier of fact, but an expert's bare assertion of validity is insufficient to satisfy this threshold requirement.  *Tyson v. Oregon Anesthesiology Group, P.C.*, Civil No. 03-1192-HA, 2008 U.S. Dist. LEXIS 44992, at *39 (D. Or. June 6, 2008).  FRE 403 authorizes the court to exclude "relevant evidence if its probative value is substantially outweighed by  a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EV. 403.

Freeman's declaration states his expert qualifications.  Generally put, he is a Professor of Epidemiology at Oregon Health & Sciences Univeristy and has advanced degrees including a Masters degree in biostatistics.  He uses statistical analysis on a daily basis in his work as a professor and as a private forensics consultant, and has published "more than 50 peer reviewed scientific publications that utilize statistical analysis."  (Freemand Decl. ¶ 2.)  He also reports that he has

OPINION AND ORDER                    18                         {KPR}

"been qualified to testify as an expert witness regarding statistical analysis and forensic epidemiology," at trial, more than two-hundred times.  (Freeman Decl. ¶ 3.)

According to Freeman, he was retained to give his expert opinion on the validity of the analysis and conclusions of Batura as offered by Pfizer in support of its motions for summary judgment.  Batura's testimony concerns alleged patterns in Arnold's "starter activity," used to support a finding that Arnold was engaged in a prohibited practice known as "form-banking," which practice was cited as the reason for her termination.  Freeman gives several reasons that he would discount Batura's testimony and conclusions.  First, Batura characterized his conclusion that Arnold engaged in misconduct as "possible," a standard that Freeman concludes fell below that of a "reasonable probability and substantial evidence" that the misconduct took place.  (Freeman Decl. ¶ 7.)  Second, Freeman characterizes Batura's finding that Arnold's SAFs were out of sequence as indirect evidence of misconduct, rather than the kind of direct evidence that would justify termination.  He writes:  "Thus, even though SAF sequence has been cited by Mr. Batura and Pfizer as an indirect measure of form-banking, there is no evidence that this is a validated construct for any type of employee misconduct or prohibited practice, including form-banking."  (Freeman Decl. ¶ 8.)  Third, Freeman states that Batura's methods did not involve statistical analysis.  He goes on to describe a statistically reliable method for evaluating when nonsequential SAF forms were indicative of form-banking, noting that even this analysis is predicated on a threshold finding that "there was a statistically reliable basis for evaluating fraudulent employee activity by looking at SAF sequence."  (Freeman Decl. ¶ 9.)  In Freeman's view, neither of these analyses were performed by Batura.

Freeman goes on to identify Batura's specific conclusions and states his own opinion that

Batura's conclusions do not necessarily follow from the data he relied on.  He notes that Batura used conditional language like "should" or "might" to express his conclusions and also that his statements lacked a foundation in statistics to reliably indicate that form-banking or other concealment took place.  Freeman concludes:  "Ultimately, it is apparent that Pfizer's claim that Ms. Arnold was form-banking because she used SAFs out of order does not rise above the level of bald assertion, and is completely lacking in any supporting evidence that would allow for a conclusion regarding the probability of the former given the latter."  (Freeman Decl. ¶ 13.)

> A.    *Freeman's Qualifications*

Pfizer argues, essentially, that Freeman has no expertise in the complex and highly regulated field of pharmaceutical sales and, therefore, cannot render an opinion on Pfizer's policies, the PDMA, and the record-keeping requirements promulgated therein.  In fact, Pfizer argues, Freeman admitted that he lacks experience in this area and that he typically testifies in cases involving personal injury and medical negligence.

Arnold argues that her termination was premised, at least in part, on a statistical analysis of her "starter activity" and that Freeman's testimony is intended to rebut the reliability of this analysis.  Arnold argues that Freeman's lack of knowledge of Pfizer's policies or the PDMA may go to the weight given Freeman's testimony, but not to its admissibility.

At deposition, Freeman did state that his role as an expert witness in this case differed from that in previous cases, in that he is typically asked to address more complex issues.  Freeman testified that "[i]n this particular case, it was simply a matter of saying, Do you have a valid basis or reliable basis for drawing an inference with regard to a certain characterization of activity . . . with regard to Ms. Arnold."  (McCool Decl., Ex 1 at 12:7-11.)  He stated that he understood the

scope of his inquiry to be limited to an evaluation of Batura's methods for evaluating Arnold's performance via her SAFs, "whether there was statistical methodology implied in his conclusions and to determine whether that methodology was a valid basis for his conclusions, valid or reliable." (McCool Decl., Ex. 1 at 45:23-46:5.)

The court agrees with Arnold that Freeman is qualified to testify as to the reliability of the methods used by Batura to evaluate the statistical significance of Arnold's SAFs. His qualifications in the field of statistics are unchallenged. The court is not persuaded that Freeman's admitted lack of expertise in the field of medical sales and the PDMA undermines his ability to evaluate Batura's methodology. For these reasons, the court admits the expert testimony of Freeman for the stated purpose.

B.     *Relevance*

Pfizer argues that, even if Freeman is found qualified to give his opinion in this case, his testimony should be excluded as irrelevant, confusing, and for failing to create a genuine issue of material fact. According to Pfizer, Freeman's testimony lacks relevance because it does not speak to whether Pfizer had a good faith belief that Arnold violated Pfizer's policies with respect to SAFs. Pfizer argues that this good faith belief is the touchstone for determining whether a termination had a lawful basis. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("Rather, courts 'only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.'" (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)). Pfizer also argues that, contrary to Freeman's claim that statistical analysis is required to evaluate violations involving SAFs, such requirement has no legal basis and,

furthermore, this court ruled against such requirement previously.[4]  Finally, Pfizer claims that Freeman's testimony is confusing and should be excluded.

Arnold argues that the standard for relevance is liberal and that Freeman's testimony is relevant as a direct rebuttal to Batura's conclusions that purport to carry the imprimatur of scientific validity.  Arnold contends that Pfizer's good faith belief, or lack thereof, is a question for the jury, and that Freeman's testimony clarifies the issue, rather than confuses it.  In sum, Arnold argues, Freeman's testimony is merely a rebuttal to Batura's claims and it tends to show that Pfizer lacked a good faith belief that Arnold was form-banking.

Pfizer cites *Green v. Kinney Shoe Corp.*, 715 F. Supp. 1122 (D.D.C. 1989) for the proposition that experts may not testify as to ultimate issues of law.  In *Green*, the plaintiff sought to admit expert testimony regarding the discriminatory nature of the defendant's use of "subjective criteria in promoting employees[.]"  *Id*. at 1123.  The court declined to admit the testimony, stating: "It should be clear to any reasonable person that a subjective promoting process could enable an employer to hide discriminatory intent."  *Id*.  As such, the court deemed the proffered expert testimony unnecessary and even potentially harmful in that it might convince a jury that the use of subjective criteria in hiring is inherently discriminatory.  Thus, the expert was not permitted to testify that an employment test was not discriminatory when "under the proper legal analysis, the test is shown to have an adverse impact and is not validated as job-related."  *Id*.  The court went on

---

[4] Pfizer cites the court's ruling (#38) on Arnold's motion to compel wherein the court essentially narrows the scope of production by Pfizer of Arnold's SAFs to those that Pfizer deems "irregular."  (*See* Pfizer's Reply at 7.)  Pfizer's present argument, that this wholly defines the relevant scope of the SAFs in this litigation, is unpersuasive.  Pfizer, having produced Batura's analysis of Arnold's SAF activity to support its assertions of irregularity, cannot plausibly argue that Arnold may not pursue a statistical analysis of the SAFs.

to discuss the admission of expert testimony regarding statistical analysis of minority representation. The testimony of the plaintiff's expert was not admitted because the expert was not a statistician, and the court "require[d] that any statistical inferences be made through statistical tests approved for use in discrimination cases." *Id.* at 1124. The court also expressed its preference "that a qualified statistician . . . make such calculations." *Id.*

Pfizer also cites *Arjangrad v. JPMorgan Chase Bank, N.A.*, 3:10-cv-01157-PK, 2012 U.S. Dist. LEXIS 71745 (D. Or. May 23, 2012). There, the plaintiff sought to introduce the testimony of an attorney with extensive experience in employment law, including litigating employment cases, advising employers as to human resources practices, and training employees in implementation of those practices. The expert, Buchanan,[5] lacked human resources training, however. Buchanan gave testimony regarding the typical practices of large employers, stating that they are motivated to investigate discrimination complaints to make a showing of good faith, though such investigations are not legally required. He also concluded that defendant Chase Bank's response to the discrimination complaint at issue was inadequate, and this conclusion was based on the incomplete set of documents provided him by the plaintiff's counsel.

The court concluded that Buchanan was qualified to give testimony on the general human resources practices of large companies, but not on Chase's policies as he had no expertise with respect to those specific policies. It wrote: "While Buchanan clearly has no formalized education or training in HR practices, I find him qualified to testify about standard HR practices in large organizations on the basis of his experience performing discrimination investigations, advising

---

[5] The court notes for clarity that the expert in *Arjangrad* has the same last name as a witness in this case, Olga Buchanan, though the two are distinct individuals.

companies, training HR professionals, and writing about HR issues." *Id*. at *11.

Although it found the expert qualified on this issue, the court also concluded that Buchanan's testimony was neither reliable nor relevant. It was not reliable because Buchanan failed to explain "how his experience performing discrimination investigations or his expertise advising employers and HR professionals led him to understand and define generally accepted standards of HR investigation practices." *Id*. at *14. Rather, the testimony asked the court to take the expert's word on the veracity of his conclusions, a posture that a court may not adopt. The court concluded the testimony was not relevant for several reasons, not the least of which was that unreliable testimony would not meet the low standard that "an expert's testimony must 'logically advance[] a material aspect of the party's case.'" *Id*. at *19 (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

At deposition, Freeman explicitly testified that he did not examine Batura's actions for bias and refused to draw a conclusion as to bias. (McCool Decl., Ex. 1 at 82:6-83:1.) He also testified that an employer should engage in "statistical analysis to determine if there is a violation of company policy," but only where the employer intends to draw a statistical inference from its analysis, as Batura did. (McCool Decl., Ex. 1 at 83:5-10; 88:7-89:5.)

Freeman's testimony is relevant and admissible on the topic of Batura's statistical methodology and its scientific reliability. Arnold presents Freeman's declaration as a rebuttal to Pfizer's allegation of form-banking and its claim that the alleged misconduct is proved by statistical analysis. Accordingly, the evidence is admissible for this purpose. To the extent that Freeman expresses his opinion as to the relative value of Batura's conclusions, or provides gratuitous negative characterizations of Batura's work, that content is hereby stricken. Accordingly, Pfizer's motion

OPINION AND ORDER                    24                    {KPR}

to strike the Freeman Declaration is granted in part and denied in part.

II.    Motion to Strike Buchanan Declaration

Pfizer argues that Buchanan's Declaration should be stricken more or less in its entirety because it is irrelevant and immaterial, lacks a basis in personal knowledge, contains inadmissible hearsay, is unduly prejudicial, is argumentative, and violates the Best Evidence Rule.  Pfizer presents its objections in a chart which includes the portion of testimony objected to, the grounds for objection, and a space for the court to indicate its ruling, presumably for the court's convenience.

In general, Pfizer lists the grounds for objection to each portion of the declaration, but does not explain how the objection applies to the portion.  In responding to this motion, Arnold takes a similar approach, adding to the chart her responses to each objection to permit the court to easily compare the portion of testimony with the objection and the response.  Arnold also argues that the objections lack specificity or analysis, and addresses the relevance of Buchanan's declaration as a general proposition.

A.    Relevance

Pfizer does not explain how Buchanan's testimony is irrelevant.  Arnold argues that Buchanan is relevant as a comparator to Arnold whose testimony provides evidence that Arnold was treated differently than similarly situated employees of Pfizer.  Arnold also argues that Buchanan's testimony is relevant evidence that Pfizer lacks credibility.  The court agrees that Buchanan's testimony has some relevance and declines to strike it based on Pfizer's unarticulated objection.

B.    Personal Knowledge

As a general rule, affidavits submitted at summary judgment must be based on personal knowledge and not merely information and belief.  *Taylor v. List*, 880 F.2d 1040, 1045 n.3 (9th Cir.

1989) (citing FED. R. CIV. P. 56(e)). Pfizer does not elaborate on its objection that Buchanan lacks

personal knowledge of the content of her declaration. Arnold argues that Buchanan is permitted to

present her perception of events she experienced and points out that Buchanan backs up many of her

assertions with documentary evidence.

Having reviewed Buchanan's affidavit, the only statement that falls outside of Buchanan's

personal knowledge is Buchanan's claim: "My District Manager L. Fox had correspondence with

other team members about my English, saying that it was not good enough." (Buchanan Decl. ¶ 5.)

That said, this statement is not relevant to Buchanan's evidentiary role in this case as a comparator

to Arnold and the court will not rely on it for any purpose. To the extent that Pfizer objects to its

inclusion in the summary judgment materials, however, the court strikes the statement.

C.    *Hearsay*

Pfizer provides no explanation for its hearsay objections. The court identifies the following

statements allegedly made by Pfizer personnel as the probable targets of this objection: statements

by Buchanan's manager that her English was not good enough and statements urging Buchanan to

confess she had lied; comments by a Pfizer manager that Buchanan's actions "raised a red flag";

statements by Pfizer employees that Buchanan's position had been filled because her short-term

disability had run out and Buchanan had failed to find a replacement position, that Buchanan should

access Pfizer job listings via another employee with computer access; a Pfizer employee's refusal

to extend a termination package to Buchanan; and a Pfizer employee's statement that Buchanan's

termination was based on her failure to obtain another position at Pfizer following her medical

absence, rather than the presently proffered explanation that she was fired due to irregularities in the

SAF activity.

OPINION AND ORDER                            26                                    {KPR}

Arnold responds that statements made by Arnold's managers at Pfizer are attributable to Pfizer itself and are, thus, are opposing party statements offered against it and not hearsay under the Federal Rules of Evidence. *See* Rule 801(d)(2)(A),(C),(D) (describing statements that are "not hearsay" and including statements "offered against an opposing party" made by the party itself, a personal authorized to speak for the party, or the party's agent or employee). Such statements are admissible as exceptions to the rule against hearsay so long as the proponent of the statement demonstrates that it "relates to a matter within the scope of the agent's employment." *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982)).

The court agrees that the statements of Pfizer managers and employees offered here are within the scope of their employment and, therefore, qualify as an exception to the rule against hearsay.

### D.    Prejudice

Pfizer identifies as prejudicial statements Buchanan's characterizations of her experience with Pfizer and Pfizer employees. In her declaration, Buchanan stated her belief that a manager did not like her because she was Russian and was successfully pursuing the American Dream. She characterized a meeting as "nasty, unprofessional" and "traumatic." (Buchanan Decl. ¶ 9-10.) She gave her impression that Pfizer was displeased that she was on medical leave.

The court does not find Buchanan's observations prejudicial such that application of Rule 403 justifies its exclusion from consideration at summary judgment.

### E.    Argumentative

Pfizer does not explain how portions of Buchanan's declaration are argumentative, and the

court declines to speculate as to what Pfizer intends.

   *F. Best Evidence Rule*

   Pfizer objects to the admission of copies of correspondence between Buchanan and Pfizer as a violation of the Best Evidence Rule, as expressed in FRE 1002 and 1003. Rule 1003 states, however, "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." FED. R. EV. 1003. Having failed to raise questions of authenticity or demonstrate unfairness, this objection is not well taken and is denied.

   The balance of Pfizer's objections are either redundant or too ambiguous and broadly applied to permit the court to properly identify and rule upon the objectionable material. These include objections that the content is speculative, assumes facts not in evidence, lacks foundation, and is improper lay opinion.

**III. Motion to Strike Arnold Declaration**

   Pfizer next seeks to strike portions of Arnold's declaration as irrelevant, inadmissible hearsay, mere embellishment, or inconsistent with prior testimony. This motion is concerned, in large part, with alleged discrepancies between Arnold's deposition testimony and declaration. Pfizer argues that Arnold may not create issues of fact by contradicting her own prior testimony. Arnold argues, however, that the alleged discrepancies are merely clarifications, elaborations, or the type of minor discrepancies that are the normal incident of witness testimony.

   The Supreme Court has recognized the "virtual unanimity" of circuit courts that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that

party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the

disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  In the Ninth Circuit,

the general rule is that

> a party cannot create an issue of fact by an affidavit contradicting his prior deposition
> testimony.  "If a party who has been examined at length on deposition could raise an
> issue of fact simply by submitting an affidavit contradicting his own prior testimony,
> this would greatly diminish the utility of summary judgment as a procedure for
> screening out sham issues of fact."

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted)

(quoting *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475

U.S. 1048 (1986)).

This rule does not extend to situations "in which a contradictory affidavit is introduced to

explain portions of earlier deposition testimony.  Rather, [the rule is] concerned with 'sham'

testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid

summary judgment." *Kennedy*, 952 F.2d at 267.  "A party 'is not precluded from elaborating upon,

explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor

inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence

afford no basis for excluding an opposition affidavit.'" *Darbut v. Three Cities Research, Inc.*, Civil

No. 06-627-HA, 2008 U.S. Dist. LEXIS 75998, at *4 (D. Or. Sept. 30, 2008) (quoting *Messick v.*

*Horizon Ind. Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995) (citations omitted)).  Therefore, the district

court must determine whether the contradictory testimony properly explains or clarifies earlier

testimony or instead contradicts it.

Pfizer's objections, Arnold's responses, and the court's rulings are summarized as follows:

1.    Pfizer objects to alleged inconsistencies regarding Pfizer policies, procedures for

documenting starter activity, and Arnold's knowledge thereof. (¶¶ 6, 9, 14, 15, 116.) Pfizer ignores the distinction between entering and synchronizing starter activity on a daily basis and entering it in the Sherlock system at the end of each week. It also incorrectly conflates Arnold's knowledge of Pfizer's policies with conversations about SAFs with her supervisors, as well as the availability of Pfizer's policy guides with Arnold's actual review of their contents. The court does not consider Arnold's declaration testimony regarding these policies in conflict with earlier testimony and declines to strike the cited paragraphs.

2.      Pfizer objects to alleged inconsistencies regarding a conversation between Arnold and Dr. Nody regarding pain medication and Arnold's ability to work. (¶ 78.) Arnold argues, and the court agrees, that the testimony is consistent and any differences are merely peripheral.

3.      Pfizer objects to alleged inconsistencies regarding the identity of Arnold's managers. (¶ 99.) Arnold argues, and the court agrees, that the testimony is consistent. Pfizer ignores the distinction given between direct and indirect managers, or the potential to have more than one manager at a given time.

4.      Pfizer objects to alleged inconsistencies regarding meetings between Arnold and Small on February 11, 2009, and April 1, 2009. (¶¶ 117, 134, 136.) Arnold testified both at deposition and in her declaration that she met with Small in February 2009 and the two discussed Arnold's injuries as well as the likelihood that she would need surgery in the coming year and would need to take off time from work. Arnold testified that Small stated that Arnold's absence would negatively impact her workload as well. The testimony is slightly confused as to whether the meeting happened on February 2 or 11, 2009, but the discrepancy is not material. Arnold also testified about a meeting on April 1, 2009, wherein Small was again made aware of Arnold's condition. There is no

discrepancy between the two accounts and the court sees no reason to discount the testimony.

5.      Pfizer objects to alleged discrepancies regarding whether Arnold provided samples of a particular drug to Dr. Barbara Graham, per Small's instruction. (¶¶129, 140.)  Arnold's declaration states that she informed Small she had "sampled" Dr. Graham three times since she requested the drug.  The deposition testimony clarifies what Arnold meant when she stated that she had "sampled" Dr. Graham.  Arnold explained that she had visited Dr. Graham's office at least three times and had either provided the sample medication as requested to Dr. Graham, provided it to a physician's assistant in the same office, or arrived and was unable to meet the particular request on that visit because she lacked the requested sample.  Whether a factfinder finds Arnold's explanation of her statement credible is not for the court to evaluate at this time.  The court finds no direct conflict in testimony to justify striking the evidence in question.

6.      Pfizer objects to alleged inconsistencies between Arnold's declaration and her deposition testimony concerning the content of her BOLI intake forms.  (¶¶ 149, 192.)  The declaration states that Pfizer's characterization in its memorandum regarding Arnold's satisfaction with Pfizer and the timing of the discrimination is false.  The deposition testimony concerns the content of the documents filed with BOLI, wherein Arnold stated that the first date of discrimination was the same as the date of termination, June 17, 2009.  Arnold argues that there is no conflict between the declaration and deposition, and further explains that she called BOLI to inform it that her intake forms contained errors.  The court agrees that the content is confusing, but notes that Pfizer failed to explain the particular discrepancies or the manner in which the two testimony excerpts are materially in conflict and declines to strike it at this time.

7.      Pfizer objects to alleged inconsistencies in Arnold's description of a half-day ride along she

took with Small.  (¶ 153.)  The court agrees with Arnold that the descriptions are entirely consistent.

8.      Pfizer objects to alleged inconsistencies with respect to Arnold's testimony regarding the May 27, 2009, meeting she had with Small and Lucherini.  (¶¶ 157-164, 169-173.)  Arnold's declaration includes much more detail than her deposition testimony wherein she was unable to recall specific documents referred to during the meeting.  Her declaration was prepared after she received those same documents through discovery, and Arnold contends that she was able to recall the meeting much more clearly with the aid of the produced documents.  The statements do not conflict and the court sees  no reason to strike the declaration testimony.  Other inconsistencies are not material on summary judgment.

9.      Pfizer objects to allegedly conflicting testimony regarding Arnold's June 2, 2009, communication with Lucherini following her diagnosis of ADD.  (¶ 178.)  The testimony is inconsistent in that Arnold states that she left Lucherini a voicemail whereas at deposition she states that she sent Lucherini an email.  The court does not consider this inconsistency material for the purpose of creating an issue of fact at summary judgment, and declines to strike the evidence.

10.     Pfizer objects to allegedly conflicting testimony regarding a June 5, 2009, communication between Arnold and Jennings.  (¶ 181.)  The only discernible inconsistency, however, concerns the manner in which the communication took place, i.e., whether Arnold contacted Jennings or vice versa.  The content is described consistently.  As such, the court declines to strike the evidence for immaterial inconsistencies.

11.     Pfizer objects to alleged discrepancies regarding events surrounding a June 17, 2009, meeting, at which Arnold was terminated from her position with Pfizer.  (¶¶ 184, 185.)  The court agrees with Arnold that the testimony is identical in all material respects and declines to strike it.

12.     Pfizer objects to alleged discrepancies regarding Arnold's communications with Pfizer employee Rahimi following her termination. (¶¶ 188, 194.) In her declaration, Arnold describes three phone conversations with Rahimi: one immediately after her termination, one to request use of Rahmini's computer, and one regarding a contact at another company. At deposition, she states that she only spoke to Rahmini once over the phone following her termination. This presents a genuine conflict in testimony. However, the discrepancy is not material to this court's disposition and does not figure into its analysis on any of the claims asserted. Accordingly, the court declines to strike the evidence as inconsistent at this juncture.

13.     Pfizer objects to an alleged inconsistency regarding the meaning of a statement made by Arnold in an email to her attorney. (¶¶ 189, 190.) The email states: "I was not able to give work my all because of my pain problem and all the drugs I'm on." (Jatana Decl. ¶¶ 13-17, 19, Exs. K-O, Q (check this cite).)  In her declaration, Arnold explains that the statement should have been attributed to her doctor and does not represent her own sentiments. In light of Arnold's explanation, these statements do not flatly contradict and should not be stricken on that basis. The related issue of whether Arnold's explanation for her statement is credible cannot be resolved on summary judgment.

14.     Pfizer objects to alleged inconsistencies in Arnold's testimony regarding her contact with the Oregon unemployment office. (¶191.) The court agrees with Arnold that no contradiction exists.

15.     Pfizer also objects on the ground that the evidence is inadmissible hearsay. As above, the court notes that statements made by Pfizer employees concerning matters within the scope of their

employment are exceptions to the rule against hearsay under the Federal Rules of Evidence.  *See* Rule 801(d)(2)(A),(C),(D) (describing statements that are "not hearsay" and include statements "offered against an opposing party" made by the party itself, a personal authorized to speak for the party, or the party's agent or employee).  Pfizer's hearsay objections are lodged exclusively against statements made by Pfizer employees in the scope of their employment.  These statements, therefore, are not hearsay and the court declines to strike them.

16.     Pfizer's objections to relevance are unexplained and the court finds the evidence relevant to the present case.

IV.     Jatana Declaration

Arnold objects to the inclusion of a dismissal memorandum prepared by BOLI as unauthenticated and inadmissible hearsay, pages 58-59 of Exhibit C.  She also objects to Exhibit N which consists of two emails between Arnold and her attorney for which Arnold claims attorney-client privilege.  Arnold argues that the emails were transmitted on her personal computer and are not the subject of the court's July 5, 2011, order that ruled Arnold had waived the privilege with respect to certain materials.

As an initial matter, Pfizer objects to this evidentiary objection as a motion filed without the proper conferral.  Local Rule 56-1(b) states:  "Rather than filing a motion to strike, a party may assert evidentiary objections in its response or reply memorandum.  Evidentiary objections in a response or reply memorandum are subject to the certification requirement of LR7-1(a)."  *Local Rules of Civil Procedure*, District of Oregon, Rule 56-1(b).  Although separate conferral may not have occurred on this particular issue, the court will excuse it in this limited instance.  The admissibility of an EEOC or BOLI report or finding is typically a disputed issue that the parties do

not resolve between them in advance of a motion to strike. Accordingly, conferral on this specific question would have been of limited utility, and the court will entertain the objection in the absence of conferral.

Regarding the BOLI report, Pfizer argues that the report has been authenticated by BOLI as a business record under FRE 803(8), a rule that permits admission of an agency's factual findings. Pfizer is correct that factual findings are admissible, but the court notes that this does not extend to hearsay statements contained within the report. *See Schuett v. Eli Lilly & Co.*, No. 3:10-CV-784-HZ, 2011 U.S. Dist. LEXIS 135015, at *51-52 (D. Or. Nov. 22, 2011) ("While Rule 803(8) allows for admission of the agency's factual findings, it does not allow the admission of hearsay contained within such factual findings.") Pfizer next argues that Arnold herself referred to the report's recommendation in her testimony and that any prejudice to Arnold has already been introduced via this testimony. The court agrees that the report is generally admissible as authenticated, but only to extent that its content otherwise complies with the rules of evidence.

Regarding the emails with Arnold's attorney, Pfizer maintains that these emails were the subject of the court's July 5, 2011, order and that this is the second time Arnold has ignored the court's ruling. Pfizer is correct that the court ordered Arnold to answer the interrogatories included in Pfizer's motion to compel (#54), including the interrogatory seeking an admission regarding the content of the emails with her attorney, to which Arnold claimed attorney-client privilege. Thus, Arnold's objection to this evidence is denied.[6]

V.   Jennings Declaration

---

[6] The court, having already issued clear rulings on this issue, will treat any further assertion of attorney client privilege as to these emails as sanctionable conduct.

Arnold objects to the admission of Paragraph 9 and Exhibit B of this declaration, arguing that it is irrelevant and unreasonably prejudicial. The evidence involves Pfizer's chart of comparator employees. According to Arnold, Pfizer failed to provide information that supports its contentions that the nine individuals are proper comparators and the evidence is therefore not relevant. Arnold also argues that the list is misleading, and prejudicial, since at least one of the claimed comparators was actually terminated for taking disability leave, rather than for starter activity violations.

Again, Pfizer objects to this evidentiary objection as a motion filed without the proper conferral. As above, the objections are properly raised and nothing in the record suggests that Pfizer would have withdrawn this exhibit had it been informed of Arnold's objection in advance. On the merits, Pfizer argues that it produced its comparator chart prior to the close of discovery and that Arnold has had ample opportunity to further investigate the contents of the chart. Pfizer also argues that Arnold, as the plaintiff, bears the burden to show that similarly situated employees received more favorable treatment, citing *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Accordingly, Pfizer concludes, Arnold may not now object to Pfizer's list of comparators, evidence highly relevant to the discrimination claim, for which she failed to conduct the requisite discovery. Finally, Pfizer objects to Arnold's characterization of its inclusion of Buchanan as a comparator as intentional, and asserts that the error was merely typographical.

The court agrees that Arnold must provide evidence in support of her prima facie claim of discrimination sufficient to create a genuine issue of material fact in response to Pfizer's evidence. The court also agrees that a list of comparators is relevant to employment discrimination claims. In the present case, it is Arnold's burden to request, via discovery, relevant comparator evidence. If Arnold did not request such evidence, Pfizer is not precluded from using its own comparator

evidence. Here, Pfizer seeks to substantiate its defense via a list of comparators, but its list lacks information that would permit the factfinder to conclude that Arnold's treatment was consistent with the treatment of other similarly situated employees. However, in her declaration, Jennings states that the comparator chart "lists nine (9) colleagues formerly of the Regional West Business Unit who also were investigated because their work activity was brought to management's attention." (Jennings Decl. ¶ 9.) She states that all nine were terminated, and only two had previously taken medical leave. Furthermore, Pfizer states that it provided the chart to Arnold prior to the close of discovery and Arnold did not further investigate the issue.

The court presently declines to strike the comparator list. Although the chart is arguably incomplete, Arnold has not established that she sought further evidence regarding the comparators. To the extent the chart itself is conclusory, Jennings's declaration provides relevant detail regarding the individuals listed in the chart. Accordingly, the court concludes that it lacks a firm basis upon which to strike the evidence and declines to do so at this stage of the litigation.

VI.    McCool Declaration

Pfizer objects to the admission of Exhibits N and M to the McCool Declaration as unauthenticated, inaccurate, and irrelevant. The exhibits are Excel spreadsheets purporting to summarize the starter activity of Rahimi and Rudkin-Manning, Arnold's coworkers. Regarding authentication, Pfizer argues that there is no indication as to who created these documents and the documents are neither extrinsically authenticated or self-authenticating. Pfizer also argues that the documents contain inaccurate information, citing the testimony of Rudkin-Manning clarifying that, as to one SAF, the date is merely illegible in part and actually reflects the date of the visit. Finally, Pfizer contends that the charts are irrelevant as they "have no tendency to prove or disprove any

material fact as they have no bearing on Pfizer's decision to terminate Plaintiff's employment for her failure to comply with Pfizer policy." (Def. Reply 3.)

Arnold responds that the spreadsheets are merely summaries of the attached SAFs, to which Pfizer lodges no complaint, and observes that such summaries are admissible under FRE 1006. The Rule states that summaries are permissible when the information summarized "cannot be conveniently examined in court" and where the proponent of the summary makes the documents summarized available for examination or production in court. FED. R. EV. 1006 (2012). Arnold has also remedied any authentication and accuracy deficiencies in the supplemental McCool Declaration (#112). The court concludes that the summaries are admissible and Pfizer's objection is denied.

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

I.    Conduct Outside of Statutory Time Period

Pfizer first argues that much of the discriminatory conduct alleged by Arnold is not actionable as it falls outside of the statutory time periods for filing discrimination claims. Pfizer notes that disability discrimination claims under both federal and Oregon law must be filed within 300 days and one year, respectively, of the date of the alleged discrimination. Pfizer cites Arnold's BOLI complaint, wherein Arnold states that the first instance of discrimination occurred on June 17, 2009, when she was terminated from her job at Pfizer. Arnold filed her EEOC charge on September 22, 2009, and her BOLI complaint on March 22, 2010. Pfizer contends that the allegedly

discriminatory and retaliatory acts that took place in 2006 through 2008 are not actionable, and notes, in reply, that Arnold does not dispute that some of the alleged conduct is time-barred and therefore not actionable.

Arnold does not dispute the time periods set forth by Pfizer and agrees that some of the conduct alleged occurred outside the time frames set forth by law. Arnold cites the date of filing the EEOC complaint as the proper date from which to determine whether past conduct is considered actionable. As such, her claims under federal law could be premised on conduct occurring after November 26, 2008, and her claims under state law premised on conduct occurring after September 22, 2008. However, Arnold argues, non-actionable conduct may still be evidence relevant to establishing a context for discrimination.

"A plaintiff must file a timely charge of discrimination with the EEOC as a prerequisite to maintaining an ADA action. 42 U.S.C. § 2000e-5(e) requires that a complainant file a charge with the EEOC within 180 days of the last act of alleged discrimination, unless the complainant initially institutes proceedings with a state or local agency, in which case the EEOC charge must be filed within 300 days." *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000) (citing 42 U.S.C. § 12117(a) which incorporates the enforcement procedures set forth under 42 U.S.C. § 2000e-5 (or "Title VII")), *overruled on other grounds by Socop-Gonzalez v. INS*, 272 F.3d 1176, 1194-1195 (9th Cir. 2001). That enforcement scheme "requires that a complainant file a charge with the EEOC within 180 days of the last act of alleged discrimination, unless the complainant initially institutes proceedings with a state or local agency, in which case the EEOC charge must be filed within 300 days." *Id*. The applicable time limit for disability discrimination claims under Oregon law is one year. *See* OR. REV. STAT. 659A.875(1) (2011) ("Except as provided in subsection (2)

of this section, a civil action under ORS 659A.885 alleging an unlawful employment practice must be commenced within one year after the occurrence of the unlawful employment practice . . . .”). This includes the state law claims alleged in this case.  *See* OR. REV. STAT. 659A.885 (2011) (making the section applicable to claims brought under ORS 659A.040 and ORS 659A.103).  Claims under the FMLA may be brought within two or three years of the date of violation, depending on whether the violation was willful.  29 U.S.C. § 2617(c)(1)-(2).  Claims for wrongful termination have a two year statute of limitations.  *Stupek v. Wyle Laboratories Corp.*, 327 Or. 433, 438 (1998).

The court agrees that, although not actionable, conduct occurring outside of the statutory period may inform the court's analysis of whether a question of fact exists that discrimination occurred.  This court has noted previously that,"while time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be considered to prove timely claims.  ‘[T]he statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim.'"  *Lucke v. Multnomah County*, CV-06-1149-ST, 2008 U.S. Dist. LEXIS 71861, at *64 (D. Or. Sept. 22, 2008) (quoting *National Railroad Passenger Crop. v. Morgan*, 536 U.S. 101, 113 (2002)).  In *Lucke*, the plaintiff asserted claims under both Title VII and the ADA, and the court applied this principle with equal weight to all claims.  The court takes the same approach in the present case and considers evidence outside the statutory periods as background evidence that may inform Arnold's timely claims.

II.    Federal and State Employment Discrimination Statutes

A.    *Disability Discrimination*

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures,

OPINION AND ORDER                41                {KPR}

the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. §12112(a).   The ADA defines "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); 29 C.F.R. §1630.2(m).   In order to prevail on an employment discrimination claim under the ADA, a plaintiff must establish that: (1) the plaintiff is a disabled person within the meaning of the ADA; (2) the plaintiff is able to perform the essential functions of the job, with or without reasonable accommodation (which the plaintiff must describe); and (3) the employer terminated the plaintiff because of the disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

The standard for establishing a prima facie case under the Oregon disability statutes is the same as under the analogous ADA provision.  *See Wheeler v. Marathon Printing, Inc.*, 157 Or. App. 290, 301 n.6, 974 P.2d 207 (1998) (noting that the Oregon statutory scheme regarding workplace discrimination against disabled persons "contain[s] language significantly similar to the ADA"); *see also* ORS 659A.139 ("O.R.S. 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended.").

### 1.    Prima Facie

#### a.    *Disability*

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1) (2008). The regulations

define "substantially limited" as:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Three factors are to be considered in determining whether an individual is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or expected permanent or long-term impact of or resulting from the impairment. 29 C.F.R. §1630.2(j)(2).

The fact that Arnold is a disabled individual is not disputed by either party.

### b.    Qualified

To meet his or her prima facie burden, a plaintiff must also present a genuine issue of material fact that he or she was qualified for his position. "A 'qualified individual' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Bates v. UPS*, 511 F.3d 974, 989 (9th Cir. 2007) (citing 42 U.S.C. § 12111(8)).

Pfizer argues that Arnold is not qualified to perform the job from which she was terminated because she is incapable of accurately reporting her starter activity and cannot drive. According to Pfizer, Arnold admitted she was not capable of performing her job duties when she acknowledged at the May 27, 2009, meeting that she knew her record "look[ed] bad"; when she admitted in an email to her attorney that pain and pain medication prevented her from giving her job at Pfizer "[her] all"; and when she stated in her BOLI complaint that her pain required her to go home and rest in

the course of her work day and that she was sometimes prevented from driving by the pain medication she was taking. (Jatana Decl., Ex. D at 22; Jatana Decl., Ex. N; Jatana Decl., Ex. C at 54.) Pfizer also argues that by violating Pfizer policies regarding starter activity, Arnold disqualified herself from her job by admitting under oath she could not perform essential duties.

Arnold responds that her extensive period of service to Pfizer in the relevant position demonstrates her ability to do her job. In fact, Arnold argues, Pfizer admits that she is qualified to perform her job duties with reasonable accommodation. Arnold objects to Pfizer's characterization of her testimony. First, regarding the statement that she could not give her all, Arnold argues that it might be considered a commentary on the quality of her work, but not her ability to perform duties with or without accommodation. She cites *Kirsch v. TDY Industries, Inc.*, Civ. No. 09-6211-AA, 2011 U.S. Dist. LEXIS 150680 (D. Or. Sept. 30, 2011), for the proposition that an admission of an imperfect performance of job duties does not amount to admission an employee was unqualified. In *Kirsch*, the plaintiff testified at deposition that his performance at work was "substandard." *Id*. at *9. Contrary to the defendant's characterization of this testimony as an admission that the plaintiff could not perform the essential duties of his position, the court wrote:

> However, construing all inferences in favor of the plaintiff, plaintiff's testimony could be interpreted as merely an admission that an assessment of his work as substandard was accurate, not an admission that he was necessarily unable to perform the job's essential functions. Moreover, even if the passage is given the meaning that defendant intends, plaintiff's assertion cannot be taken as an admission that he could not perform the essential functions of the position *with or without accommodation*.

*Id*. at *24 (emphasis in original). Arnold also argues that her comments about medication and driving are not a basis upon which to find her unqualified, because she was able to drive and worked with her doctors to create a medication schedule that allowed her to manage her pain without

interfering with her ability to drive.  She cites testimony of fellow employees that she was an able driver, and also the time that Small accompanied her on a field ride and she drove without incident.

Finally, Arnold argues that her ability to adequately comply with starter administration policies has not been disproved nor has she admitted that she could not comply.  Rather, as a long-time employee of Pfizer, Arnold established her ability to comply with starter administration policies.  She points to prior audits of her starter activity that revealed no abnormalities.  She also disputes Pfizer's characterization of her statements regarding starter administration as admissions.  Rather, she claims that the statements she made in the May 27, 2009, meeting were merely acknowledgments that she had made innocent organizational or administrative errors in filling out a limited number of SAFs.  In fact, according to Arnold, to the extent that her errors on SAFs were caused by ADD, a condition with which Arnold has been diagnosed, termination on the ground that she erred in filling out SAFs amounts to disability discrimination in and of itself.  Arnold claims that, upon learning of her ADD diagnosis, Pfizer should have engaged in the interactive process to seek a reasonable accommodation.

In reply, Pfizer contends that Arnold is contradicting prior sworn testimony regarding her ability to drive.  Pfizer refers the court to statements made in Arnold's BOLI complaint that contradict her present claim that pain medication did not prevent her from driving.  Arnold wrote: "I will always be in chronic pain due to the injuries from the accident. . . .  It would require taking pain medications where I was unable to drive." (Jatana Decl., Ex. C at 54.)  Thus, Pfizer contends, there is no relevant dispute that Arnold was unable to drive and, thus, unable to perform her duties at Pfizer.

In response to Arnold's claims regarding her diagnosis of ADD, Pfizer responds that the

diagnosis was made after the investigation of Arnold had already begun and after the termination decision had already been made. As such, Pfizer contends that the diagnosis is irrelevant to the present claims.

The court agrees with Arnold that Pfizer has failed to establish, as a matter of law, that she was not qualified to perform the essential functions of her job. First, Arnold's purported admissions that her record "looked bad," that she could not give her job "her all," and the statements made in her BOLI complaint regarding pain and her ability to drive are not unequivocal, clear admissions that establish that she was not qualified. Rather, the statements are susceptible to interpretation and raise issues of fact. Contrary to Pfizer's argument, the claimed inconsistencies are not flatly contradictory and are subject to competing factual interpretations. Second, Arnold's ability to accurately record her starter activity is a central issue in this case. Although Pfizer contends that this failure was the true reason for Arnold's termination, both sides have produced evidence to support their competing propositions. The results of Batura's investigation suggests impermissible conduct by Arnold, while the expert testimony of Freeman undermines the methodology used by Batura. The testimony of other Pfizer employees suggests that inconsistencies in Arnold's starter activity were the result of innocent mistakes or carelessness that are within the standards Pfizer employees are generally expected to meet. The evidence also suggests that the starter activity investigation was initiated after Arnold's supervisor, Small, became aware of the extent of and limitations posed by Arnold's disability. Third, the parties dispute the impact of Arnold's ADD diagnosis, with Arnold claiming that it should have triggered the interactive process and preempted her termination and Pfizer claiming that the termination decision had already been made and so the ADD diagnosis was too late to prevent termination and, therefore, not an actionable basis for a claim

OPINION AND ORDER                    46                    {KPR}

of discrimination.  This discussion veers into "causation" territory, which the court discusses below, but on the question whether Arnold was "qualified" to record her starter activity, the court notes only that the issue is in dispute and presents genuine issues of material fact.

The court finds that genuine issues of material fact exist regarding Arnold's qualifications.

c.    Causation

A plaintiff must also demonstrate at least a genuine issue of material fact as to whether he suffered an adverse employment action because of his or her disability.  To establish causation under the ADA:

> the plaintiff must show that the defendant had knowledge of her disability when making the adverse employment decision.  However, the plaintiff's disability need not be the sole reason for the defendant's actions.  Rather, liability attaches when the plaintiff's disability is a "motivating factor" in the defendant's adverse employment decision.

*Lucke,* 2008 U.S. Dist. LEXIS 71861, at *100 (internal citations omitted); *see also Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005) ("Therefore, we hold that the ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation – a motivating factor standard.")).  The parties do not dispute that Pfizer had knowledge of the limitations placed on Arnold by her back injury and resulting chronic pain.  They do dispute whether Pfizer knew of Arnold's ADD diagnosis prior to its decision to terminate her.

Pfizer argues that it did not, and that Arnold cannot establish that she was terminated because of her ADD diagnosis.  Pfizer's investigation into Arnold's performance had been going on for months and it made the decision to terminate Arnold prior to receiving notice of her ADD diagnosis.  Pfizer contends there is no evidence that Arnold's termination was for any other reason than for

violations of Pfizer's starter administration policies, including her disability, workers compensation claim, or injured worker status.  Pfizer characterizes Arnold's theory that her supervisors collaborated in an effort to find a basis for termination as merely speculative and points out that, at the time of her termination, Arnold had no surgeries or medical leave pending.

Arnold responds that timing alone can support an inference of causation.  According to Arnold, she first met Small in February 2009, at which time she offended Small by getting up and walking around during a meeting, and later explained that she had to move around because she had a permanent back problem that would likely require additional surgery.  Two months later, Small overheard Arnold telling Lucherini about her need for surgery.  On both occasions, Small contacted her colleagues about Arnold and later launched an investigation into Arnold's starter activity.

Further, Arnold argues, there is a factual dispute regarding the timing of the final termination decision.  Arnold points out that she informed Lucherini of her diagnosis of ADD on June 2, 2009, but was not actually terminated until June 17, 2009.  In the interim, she was told by Jennings that she would be coached to improve her starter activity reporting, not that she would be terminated.  Arnold argues further that, even if Pfizer made the decision to terminate her prior to the ADD diagnosis, upon being apprised of her ADD diagnosis it was unlawful for Pfizer to terminate her for the consequences of this disabling condition.

In reply, Pfizer argues that mere temporal proximity is insufficient to establish causation, though it may inform the causation analysis when viewed in the totality of the circumstances.  Pfizer reiterates its argument that the termination decision was made before Pfizer was notified of Arnold's latest diagnosis of ADD.  Pfizer also argues that it had no duty to engage in the interactive process to accommodate Arnold's ADD because it had not been triggered by Arnold's request for

accommodation or Pfizer's recognition that such accommodation was needed, citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000). In *Barnett*, a U.S. Air employee injured his back while handling cargo. He went on disability leave and when he returned to work, he realized he could no longer handle cargo without accommodation. In order to retain his position, he suggested two ways in which U.S. Air could accommodate his disability. Five months later, U.S. Air summarily denied Barnett's suggested accommodations, but told him that he "could bid for any job within his restrictions." *Id.* at 1109. The court, in some depth, discussed the requirements of the interactive process and the manner in which the process was initiated. It wrote: "The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Id.* at 1112. The court noted that an employer should itself initiate the interactive process where it "(1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation." *Id.*

In light of this binding precedent, the court is not persuaded that Pfizer is exempt from an otherwise valid duty to engage in the interactive process because Arnold did not affirmatively request accommodation for ADD. The record before the court presents, at a minimum, genuine issues of material fact regarding whether Pfizer should have taken action upon being notified that Arnold's suffered from ADD, a condition that arguably impacted her ability to record starter activity. Pfizer's primary contention is that the final decision regarding termination had already been made prior to Arnold's ADD diagnosis which, in addition to undermining Arnold's theory of causation, excused Pfizer from its duty to engage in the interactive process as to Arnold's ADD.

Arnold cites a decision from this district, *Brown v. City of Salem*, Civil No. 04-1541-HA, 2007 U.S. Dist. LEXIS 14738 (D. Or. Feb. 27, 2007), for the proposition that a termination based on the symptom of a disability is equivalent to discrimination for the disability itself. The court acknowledged that a disabled individual is not exempt from normal disciplinary procedures based on the commission of misconduct: "It is true that the ADA does not require that an employer abandon appropriate employee discipline, up to and including termination, because an employee requests an accommodation after the fact." *Id.* at *16 (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)). Even so, it noted that the Ninth Circuit has ruled "that conduct resulting from the disability is considered to be part of the disability and that termination based on that conduct is unlawful." *Id.* (referencing *Dark v. Curry Co.*, 451 F.3d 1078, 1084 (9th Cir. 2006) and *Humphrey v. Memorial Hospitals Assoc*, 239 F.3d 1128, 1139-1140 (9th Cir. 2001)).

Pfizer cites *Brohm v. JH Props., Inc.*, 947 F. Supp. 299 (W.D. Ky. 1996), wherein the plaintiff, a doctor, first mentioned his disability, sleep apnea, at the time of termination. He was nonetheless terminated, but subsequently received a diagnosis of that disability and informed his employer of said diagnosis. Even so, the court "held that a doctor with sleep apnea was fired 'for his specific conduct – sleeping on the job – and not because of a disability manifested by the sleeping.'" *Brown*, 2007 WL 671336, at *9 (quoting *Brohm*, 947 F. Supp. at 300). The *Brown* court distinguished this case, noting that the employer in *Brown* had knowledge of the disability and had previously made attempts to accommodate it, whereas in *Brohm* the employer had no knowledge of a disability. Furthermore, the *Brown* court observed that Ninth Circuit precedent "supersede[d] the reasoning presented in *Brohm* that addresse[d] a factually distinct situation." *Brown*, 2007 WL 671336, at *9.

The parties cite a number of cases involving retaliation claims and the temporal proximity between the protected activity and the alleged discrimination. Although the timing of the adverse employment action and the revelation as to an employee's disability are often critical to analyzing a discrimination claim, the standard for a retaliation claim is not appropriate here. The court will consider the sequence of events in this case as context for the discrimination claim, but declines to import a standard from the distinct claim of retaliation that is discussed below. In the court's view, there are two primary questions regarding causation: first, whether Arnold was terminated because of past and future costs associated with her back injury and pain management issues and, second, whether the ADD diagnosis was a motivating factor in Arnold's termination.

As to the first issue, Arnold has raised genuine issues of material fact as to whether her original disability was a motivating factor in her termination. She presents evidence that Pfizer made it difficult for her to return from previous periods of disability leave; that it failed to timely provide the vehicle she requested as an accommodation; and that Pfizer medical staff encouraged her to take disability leave, rather than facilitate her efforts to adjust her medication. Arnold also documents her difficulties with Small: Small was upset when Arnold got up during a meeting; she had knowledge of Arnold's need for additional surgery; she acted strangely and asked inappropriate questions during a ride along; and she initiated an investigation into Arnold's work activity, including taking of leave and starter activity, but did not investigate other employees. Arnold also presents evidence that the Batura investigation was intended to find a reason to terminate her in that it was not triggered by any overt failure on Arnold's part; four of the five doctors queried confirmed their signatures on the SAFs; and Batura informed the FDA that Arnold was technically compliant with the PDMA.

As to the second issue, the court agrees with Arnold that the timing of Pfizer's termination decision is in dispute and a factfinder could reasonably conclude that the final termination decision had not been made at the time Arnold notified Pfizer of her new diagnosis. Accordingly, the court concludes that there are genuine issues of material fact regarding the causation prong of a prima facie discrimination claim under the ADA and the Oregon Rehabilitation Act.

In sum, Arnold has met her prima facie burden with respect to her claims of discrimination, and the burden shifts to Pfizer to articulate a legitimate non-discriminatory reason for her termination.

### 2.    Legitimate Non-Discriminatory Reason

Pfizer argues that it had a legitimate non-discriminatory reason to terminate Arnold: her practice of form-banking in violation of Pfizer policies and federal law. According to Pfizer, this allegation is corroborated by Pfizer's internal investigation and Arnold's own testimony under oath. Pfizer further argues that, even if Arnold was not actually form-banking, Pfizer held a good faith belief that its basis for termination was valid and cannot be liable if it later proves invalid. Pfizer cites *Villiarimo*, 281 F.3d 1054, for the proposition that an employer's good faith and non-discriminatory belief that termination is warranted is sufficient to form a legitimate non-discriminatory reason for the termination.

In *Villiarimo*, the plaintiff was terminated based on the testimony of three coworker witnesses. She argued that the termination was not warranted because the three witnesses were lying and, thus, her employer's reason for terminating her was invalid. The court wrote: "In judging whether Aloha's proffered justifications were 'false,' it is not important whether they were *objectively* false (e.g., whether Villiarimo *actually* lied). Rather, courts 'only require that an

employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'" *Id.* at 1063 (quoting *Johnson*, 260 F.3d at 733-734 (emphasis in original)). As such, Pfizer argues that its reliance on the starter activity report prepared by Batura, as well as its perceptions as to Arnold's other alleged incompentencies, were sufficient ground upon which to base its termination decision, the objective reality of Arnold's perceived failings notwithstanding.

Arnold responds that the reason proffered by Pfizer, form-banking, is not supported by evidence or, at a minimum, raises questions of material fact. Arnold presented the expert testimony of Freeman who questions the methodology used by Batura to reach his opinion. Arnold also argues that Pfizer did not attempt to verify Arnold's starter activity and can produce no objective evidence of actual misconduct by Arnold. As such, Arnold contends that the proffered non-discriminatory reason for terminating her was not legitimate. First, Arnold argues that she did not admit to form-banking at any time, but merely recognized a number of mistakes on her SAFs when Pfizer pointed them out to her. In fact, she repeatedly denied form-banking. Second, Arnold argues that Pfizer's internal investigation is not reliable evidence that she was form-banking. As such, she argues, there are at least issues of fact as to whether Pfizer had a legitimate, non-discriminatory reason to terminate Arnold.

The court agrees that whether Arnold was actually form-banking is a disputed issue of fact. The court recognizes that where an employer holds a good faith belief that a termination is valid, the employer cannot be liable when it is later revealed that the basis for termination was actually invalid. The court nonetheless concludes that issues of fact remain as to whether the investigation of Arnold was undertaken in good faith and whether Pfizer's subsequent reliance on the results of that investigation was simiarly based in good faith. Even so, Pfizer has met its burden to raise a

genuine issue of material fact that it had a legitimate, non-discriminatory reason for Arnold's termination.

### 3. Pretext

To establish pretext, a plaintiff must present evidence above and beyond that required to state a prima facie case, but the evidence may be either direct or indirect. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). As the Supreme Court held: "the plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Where the plaintiff presents direct evidence of pretext, the evidentiary requirement is minimal; where the plaintiff presents indirect evidence, it must be specific and substantial. *Id.* at 1222. Differing treatment of similarly situated individuals may act as evidence of pretext. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("A showing that the County treated similarly situated employees outside Vasquez's protected class more favorably would be probative of pretext." (citing *Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602, 609 (9th Cir. 1982) (en banc))). These individuals, or comparators, must be similar to the plaintiff "in all material respects." *Beck v. UFCW, Local 99*, 506 F.3d 874, 885 (9th Cir. 2007).

Pfizer argues that Arnold cannot establish pretext as a matter of law. First, Pfizer argues that it strictly enforces starter activity policies and presents nine comparator employees that it terminated for similar violations. (Jennings Decl. ¶ 6.) Pfizer presents comparator evidence to bolster its claim of strict enforcement, noting that nine Pfizer employees in the western division were terminated for starter activity violations between December 2007 and June 2009, only two of whom also took

medical leave.  Second, according to Pfizer, Arnold offers only her subjective belief that her termination was motivated by unlawful discrimination, pointing to Arnold's alleged admission that she lacked evidence of discrimination and relied exclusively on her personal opinion.  Third, Pfizer argues that it had opportunities sever its relationship with Arnold when it instituted mass layoffs, and that this fatally undermines Arnold's pretext argument.

Arnold responds that she was, in fact, treated differently from similarly situated employees: Buchanan, Rahimi, and Rudkin-Manning.  Buchanan is also on Pfizer's list of comparators.  The parties dispute whether Buchanan was fired for starter activity violations or whether this was, again, a pretext to conceal the fact that Buchanan was fired because she took medical leave.  Although Jennings testified that Buchanan was fired for starter activity violations, Buchanan's termination letter, signed by Jennings, states that she was terminated for failing to return to work after her medical leave was exhausted.  As such, Arnold also argues that Jenning's testimony should be afforded less credibility in general.

Rahimi and Rudkin-Manning worked in Arnold's department and were also supervised by Small and, according to Arnold, samples of their starter activity contain mistakes similar to those upon which Arnold's termination was premised.  However, unlike Arnold, they were neither investigated nor disciplined.  Pfizer argues that this is what sets Rahimi and Rudkin-Manning apart: they were not investigated because they gave Pfizer no cause to suspect deficiencies in their work activity.  Pfizer also contends that their starter activity violations were less serious than Arnold's and they are therefore not proper comparators.

The court concludes that there are issues of fact with respect to the comparator evidence.  Further, other record evidence raises the inference that the investigation into Arnold's starter activity

was initiated in bad faith, and for the purpose of finding a reason to terminate Arnold.  As such, Arnold has raised questions of fact regarding pretext and summary judgment is denied on the discrimination claims.

  *B. Retaliation*

  Arnold alleges that Pfizer retaliated against her for pursuing her rights under the ADA.  In evaluating claims of retaliation under the ADA, the Ninth Circuit applies the burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Brown v. City of Tucson*, 336 F.3d 1181, 1186 (9th Cir. 2003) (citing, among other authorities, *Barnett v. U.S. Air*, 228 F.3d at 1121).  To state a prima facie claim under the ADA, the plaintiff must show "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

  Oregon law provides:  "It is unlawful for an employer to discriminate against an individual with respect to hire or tenure or any term or condition of employment because the individual has applied for benefits or invoked or used the procedures provided for in ORS 659A.103 to 659A.145 or has given testimony under the provisions of ORS 659A.103 to 659A.145."  OR. REV. STAT. 659A.109 (2011).  "To prevail on a claim for retaliation under [the Oregon Rehabilitation Act], a plaintiff must establish (1) that he or she invoked one or more rights [under the Act], and (2) that he or she suffered an adverse employment action motivated in substantial part by the plaintiff's invocation of such rights."  *Nelson v. Unified Grocers, Inc.*, CV. 10-531-PK, 2011 U.S. Dist. LEXIS 151483, at *40-41 (D. Or. July 18, 2011).

  1. <u>Prima Facie</u>

  Pfizer argues that Arnold cannot establish a prima facie case of retaliation because there is

no evidence that Pfizer retaliated against her for filing a workers compensation claim. Pfizer cites the lack of temporal proximity between the protected activity, filing the claim, and Arnold's termination, noting that the termination occurred four years after Arnold filed for workers compensation. Pfizer also points out that it granted Arnold's requested medical leave six times, both before and after Arnold's workers compensation claim, and returned her to her same position and rate of pay each time. Pfizer also cites the fact that it provided Arnold with a vehicle to accommodate her lifting restrictions. In light of these facts, Pfizer contends that Arnold cannot establish a prima facie case of retaliation.

Arnold argues that Pfizer has failed to move for summary judgment on her ADA retaliation claim because its argument pertains solely to her workers compensation claim. Pfizer maintains that its argument is directed at the burden-shifting framework for evaluating retaliation claims under the ADA. The court agrees that Pfizer did in fact address Arnold's ADA retaliation claim and will thus evaluate whether Arnold has presented a prima facie case of retaliation.

a.    Protected Activity

Under the ADA, it is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 12203 (2012). A request for reasonable accommodation of a disability qualifies as protected activity under the ADA and under ORS 659A.109. *Coons v. Secretary of the United States Dept. of the Treasury*, 383 F.3d 879, 887 (9th Cir. 2004); *Laird v. Marion County*, Civil No. 04-6154-HO, 2005 U.S. Dist. LEXIS 36686, at *11-12 (D. Or. July 14, 2005). The act of filing for workers compensation benefits qualifies as protected activity under the

Oregon Rehabilitation Act. *See Stanich v. Precision Body & Paint*, 151 Or. App. 446, 457 (1997)

(evaluating whether the plaintiff had "establish[ed] a prima facie case of retaliatory discharge on a

theory that defendants carried out their decision to fire plaintiff because she filed a workers'

compensation claim.").  The Ninth Circuit has not yet ruled whether filing a workers compensation

claim qualifies as protected activity under the ADA, but "[n]early every court that has confronted

the issue has held that the filing of a workers' compensation claim in itself is not protected activity

under the ADA – in other words, that an ADA-based claim of retaliation for the filing of a workers'

compensation claim cannot stand." *Kendall v. Donahoe*, 2012 U.S. Dist. LEXIS 180849, at *17

(W.D. Pa. Dec. 21, 2012); *see also Williams v. City of Las Vegas*, 359 Fed. Appx. 753, 754-755 (9th

Cir. 2009) (deciding the motion on other grounds and thus not "reach[ing] the question of whether

or not the filing of a workers' compensation claim is a protected activity under the ADA . . . .").

In this case, Arnold engaged in the following potential protected activity:  filing a workers

compensation claim and requesting accommodation for her disability.

### b.    *Adverse Employment Action*

The parties do not dispute that Arnold suffered an adverse employment action when Pfizer

terminated her.

### c.    *Causation*

Pfizer's argument regarding causation focuses on the lack of temporal proximity between

Arnold filing for workers compensation benefits and her eventual termination.  Pfizer argues that

the length of time between the protected activity and the adverse employment action may be relevant

to analyzing causation, but "there is no set time within which acts necessarily support an inference

of retaliation." *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).  Proximity alone may

justify an inference of retaliation, but only where the temporal proximity is "very close." *Brown*, 336 F.3d at 1187 (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001)); *see also Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 1998) ("When adverse employment decisions closely follow complaints of discrimination, retaliatory intent may be inferrred.").

The court agrees that Arnold's workers compensation claim is too distant in time to raise an inference of retaliation, particularly in light of the fact that Pfizer did not lay off Arnold when it had the opportunity, after she filed her workers compensation claim. However, Arnold's requested accommodation is much closer in time to her termination. In fact, the request caused Pfizer's medical staff to look more closely at Arnold's medical file and to object to her medication regime as incompatible with her employment at Pfizer. The court notes, however, that Arnold made her request prior to a round of layoffs at Pfizer, and that she survived the layoffs in spite of the request for accommodation. Even so, the request could be construed as a factor that led to her ultimate termination.

Under the ADA, Arnold need only establish a causal connection between the protected activity and the termination. In light of the evidence presented, the court concludes that there are questions of fact as to whether Arnold's request for accommodation is causally linked to her termination, this despite the intervening round of layoffs. As such, Arnold has established causation sufficient to survive summary judgment on her ADA retaliation claim. Under Oregon law, however, Arnold must establish that her termination was "motivated in substantial part" by her request for accommodation. The court concludes that there is insufficient evidence to raise the inference that her termination was due, in substantial part, to her accommodation request and, accordingly,

OPINION AND ORDER                    59                    {KPR}

Arnold's retaliation claim under the Oregon Rehabilitation Act fails.

### 2.    Legitimate Non-Discriminatory Reason

The analysis of Pfizer's legitimate non-discriminatory reason for Arnold's termination is the same as for the discrimination claim.  Accordingly, the court finds genuine issues of material fact.

### 3.    Pretext

"Under Ninth Circuit law, '[c]ircumstantial evidence of pretext must be specific and substantial in order to survive summary judgment.'" *Brown*, 336 F.3d at 1188 (citing *Bergene v. Salt River Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001)).  As above, Arnold has raised genuine issues of material fact as to whether Pfizer's proffered reason for her termination was mere pretext.

In conclusion, summary judgment on Arnold's ADA retaliation claim is denied and summary judgment on Arnold's state law retaliation claim is granted.

### III.    Workers Compensation Discrimination

Oregon Revised Statutes provide:  "It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws."  OR. REV. STAT. 659A.040 (2011).  ORS chapter 656 governs workers compensation.  *See* OR. REV. STAT. 656.001 (2011) ("This chapter may be cited as the Workers' Compensation Law.").  To state a prima facie case under ORS 659A.040, a plaintiff must show:  "(1) that the plaintiff invoked the workers' compensation system; (2) that the plaintiff was discriminated against in the tenure, terms or conditions of employment; and (3) that the employer discriminated against the plaintiff in the

tenure or terms of employment because he or she invoked the workers' compensation system."
*Stanich*, 151 Or. App. at 457.  Unlike cases evaluated under *McDonnell-Douglas*, the defendant's
assertion of a non-discriminatory action is insufficient to shift the burden back to the plaintiff or to
prevail on summary judgment:

> the Ninth Circuit, applying Oregon law, concluded that where an employee
> establishes a prima facie claim of unemployment discrimination, summary judgment
> is inappropriate even in the face of assertions by the defendant of nondiscriminatory
> action. Furthermore, . . . "[a] plaintiff's prima facie case does not disappear merely
> because a defendant asserts a nondiscriminatory reason which may or may not
> persuade the trier of fact."  Defendant's evidence does not negate the inference that
> plaintiff's workers' compensation claim motivated defendant's "termination plan."

*Hardie v. Legacy Health System*, 167 Or. App. 425, 437, 6 P.3d 531 (2000) (citing *Messick*, 62 F.3d
at 1232, quoting *Henderson v. Jantzen, Inc.*, 719 P.2d 1322, 79 Or. App. 654, 658 (1986), *rev den*
726 P.2d 934, 302 Or. 35 (1986)).

Arnold alleges that Pfizer took adverse actions against her because she reported an on-the-
job injury, applied for workers compensation benefits, and was placed on light duty as a result and
on doctor's orders.  Pfizer argues that Arnold's injured worker discrimination claim fails for the
same reasons that her retaliation claim fails, namely that she cannot establish a causal connection
between her workers' compensation claim in 2005 and her termination by Pfizer in 2009.  Arnold
claims that she invoked the workers' compensation system when she indicated her need for further
surgery in April 2009.  She incorporates by reference her causation arguments from her retaliation
claim and argues further than an inference of improper motive can be drawn from Pfizer's treatment
of comparator employees.

As above, Arnold has failed to raise a question of fact that there was a causal connection
between her claim for benefits and her termination and summary judgment on this claim is granted.

IV.    Family Medical Leave Act

The Family and Medical Leave Act ("FMLA") was designed to "entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition[.]" 29 U.S.C. § 2601 (2012).  Under the FMLA it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this [the FMLA]."  29 U.S.C. § 2615(a)(2) (2012).  The FMLA confers two "substantive rights" on covered employees:  the right to take up to twelve weeks of unpaid, qualifying leave and the right to restoration to the original or an equivalent position upon his or her return.  *Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003).  The FMLA prevents an employer from interfering with the employee's right to take leave by refusing to authorize leave, discouraging the use of leave, or considering leave as a negative factor in an employment action.  *Id.* at 1132-1133.  "In the Ninth Circuit, 'the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave.'"  *Peterson v. Tri-County Metropolitan Transportation District of Oregon*, CV-06-1828-ST, 2008 U.S. Dist. LEXIS 20881, at*24 (D. Or. Mar. 14, 2008) (quoting *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001)).  Instead, the anti-termination and retaliation provisions apply to discrimination and retaliation visited on an employee after that employee has opposed an employer's violation of the FMLA.  *Id.*  Accordingly, a claim alleging termination based on the exercise of FMLA rights "is solely an 'interference' claim under the FMLA."  *Id.*

The *McDonnell-Douglas* burden-shifting analysis is inapplicable to FMLA claims and a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected

leave constituted a negative factor in the decision to terminate her." *Bachelder*, 259 F.3d at 1125. A claim may be proved via "direct or circumstantial evidence, or both." *Id.* The employer's subjective belief as to whether it violated the FMLA is irrelevant to liability, though it may impact the calculation of damages, and the employer must determine whether leave requested is covered under the FMLA. *Id.* at 1130; *see also Liu*, 347 F.3d at 1135 ("A violation of the FMLA simply requires that the employer deny the employee's entitlement to FMLA leave." (citing 29 C.F.R. § 825.220(a)(1), (b)). "Employees need only notify their employers that they will be absent under circumstances which indicate that the FMLA might apply . . . ." *Id.*

Pfizer argues that Arnold's FMLA claim fails for several reasons. First, Arnold took medical leave six times in approximately eight years, and each time was returned to the same position and the same rate of pay as she was at prior to taking leave. Second, the significant gap of time between her most recent medical leave and her termination undermines her claim that exercising her rights under the FMLA contributed to Pfizer's termination decision. Third, Arnold had no pending leave requests at the time of her termination. Fourth, comparator evidence shows that she was treated the same as other Pfizer employees that were found to have violated starter administration policy. Pfizer argues that this case is similar to *Mink v. Marion County Juvenile Dept.*, Civ. No. 08-6298-AA, 2009 U.S. Dist. LEXIS 118690 (D. Or. Dec. 17, 2009). In *Mink*, the plaintiff argued that his employer's past threat that he would be terminated if he ran out of paid and unpaid leave constituted interference with his exercise of rights under the FMLA. The court concluded that, even if this threat was substantiated and timely, it was insufficient to establish that his use of leave was a negative factor in his termination, in light of the fact that the employer initiated termination proceedings upon learning that the plaintiff had failed a drug test for methamphetamine. The court wrote:

> Plaintiff presents no evidence that his FMLA leave was considered or discussed at the time he was terminated. Rather, the record reflects that plaintiff was permitted and did, in fact, take medical leave on three occasions over a three-year period. Termination procedures were not undertaken until plaintiff tested positive for methamphetamine, some three months after his most recent medical leave.

*Id.* at *19. Pfizer argues that, as in *Mink*, Pfizer granted Arnold leave on multiple occasions, Arnold was not subject to negative treatment as a result of the leave, and there is simply no evidence that it was a contributing factor to her termination.

Pfizer further argues that an employer may terminate an employee while on FMLA leave or with leave pending where an independent basis for termination exists. "In other words, even though an employee has requested future, or is currently on, medical leave under FMLA or OFLA, they must continue to perform their job duties to their employer's satisfaction and continue to comply with the employer's policies, or be subject to discipline, including termination." *Lawson v. Walgreen Co.*, CV. 07-1884-AC, 2009 U.S. Dist. LEXIS 25441, at *19 (D. Or. Mar. 20, 2009).

Arnold disputes Pfizer's characterization of the evidence and maintains that Pfizer interfered with her exercise of rights protected under the FMLA. Arnold argues that it is not dispositive that Pfizer granted her leave several times because Pfizer's conduct otherwise interfered with her use of medical leave. According to Arnold, Pfizer made it difficult for her to return from prior periods of medical leave and, in close temporal proximity to her termination, at least one supervisor made negative comments about leave associated with an upcoming surgery. For these reasons, Arnold contends there are genuine issues of material fact that preclude summary judgment on this claim.

For purposes of this FMLA interference claim, Arnold need show only that the exercise of her rights under the FMLA was a negative factor in Pfizer's decision to terminate her. Pfizer may rebut this prima facie showing if it can establish that she would have been terminated

notwithstanding the exercise of her rights under the FMLA. Arnold has presented evidence that raises genuine issues of material fact regarding whether her use of medical leave was a negative factor in her termination: Pfizer had a history of complicating her return from medical leave; her new supervisor made repeated inquiries about her potential need for additional surgery and leave time; Arnold had indicated to her supervisors that she would need additional surgery and leave time; and the investigation into her starter activity was initiated after Arnold's need for additional leave came to the attention of Pfizer management.

Pfizer contends that it had an independent basis upon which to terminate Arnold and that she cannot avoid a lawful termination because she indicated a future need to take leave under the FMLA. Arnold argues that she has presented prima facie evidence of interference with the exercise of rights under the FMLA. The court agrees that a reasonable factfinder could conclude that Pfizer interfered with Arnold's FMLA rights and that genuine issues of material fact exist regarding whether the leave was a negative factor in Arnold's termination. Accordingly, Pfizer's motion for summary judgment on this claim is denied.

## V.    Wrongful Termination[7]

"The elements of a wrongful discharge claim are simple: there must be a discharge and that discharge must be 'wrongful.'" *Moustachetti v. Oregon*, 319 Or. 319, 325, 877 P.2d 66 (1994). In general, an employee may be terminated for any reason, "absent a contractual, statutory or constitutional requirement[.]" *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 n.2, 40 P.3d 1059 (2002). However, "[a] termination is wrongful when an employee is terminated for: (1) fulfilling an important public duty; or (2) exercising a job-related right that reflects on important public

---

[7] The terms "discharge" and "termination" are used interchangeably in this disposition.

policy.  Determining whether a public duty exists is a question of law." *White v. TA Operating Corp.*, Civil No. 06-1747-AA, 2008 U.S. Dist. LEXIS 48103, at *11-12 (D. Or. June 19, 2008) (citing *Babick*, 333 Or. at 407).

"Under Oregon law, the common law remedy for wrongful discharge or termination is available only in the absence of an adequate statutory remedy." *Courtney v. Oregon Dept. of State Police*, Civ. No. 06-6233-TC, 2008 U.S. Dist. LEXIS 53282, at *10 (D. Or. July 11, 2008) (citing *Delaney v. Taco Time Int'l, Inc.*, 297 Or. 10, 681 P.2d 114, 118 (1984)).  In *Draper v. Astoria School District No. 1C*, 995 F. Supp. 1122, 1130-31 (D. Or. 1998), *abrogated on other grounds by Rabkin v. Oregon Health Sciences University*, 350 F.3d 967 (9th Cir. 2003), the court stated that "a claim for common law wrongful discharge is not available in Oregon if (1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy (regardless of whether the courts perceive that remedy to be adequate)."

This district previously recognized a separate claim for wrongful termination where the plaintiff had also alleged discrimination under Title VII and its state law analogue, ORS 659A.030.  *See Halseth v. B.C. Towing, Inc.*, Civil No. 04-795-JE, 2005 U.S. Dist. LEXIS 42080, at *31 (D. Or. Aug. 23, 2005) ("Like most of the other judges and magistrate judges in this district, I have concluded that the remedies available under Title VII and parallel Oregon state law do not preclude claims for wrongful discharge under Oregon common law." (citations omitted)).  However, recent legislative action has expanded the remedies available under ORS 659A.030 and altered the preemption analysis.

In *Battan v. Allwest Underground, Inc.*, Civ. No. 08-707-BR, 2008 U.S. Dist. LEXIS 68735,

at *16 (D. Or. Sept. 5, 2008), Judge Brown noted that "the Oregon Legislature enacted House Bill 2260 in 2007, which added § 659A.030 to the list of provisions for which a jury trial and compensatory and punitive damages are available." Courts in this district had previously declined to preempt a wrongful discharge claim because Title VII "cap[ped] compensatory and punitive damages," and ORS 659A.030(1)(f) "limit[ed] recovery of economic damages." *Id.* Under the expanded remedial scheme set forth by House Bill 2260, the court held that "[section] 659A.030(1)(f) provides adequate remedies to the extent Plaintiff intended to base his claim on wrongful discharge in retaliation for pursuing his right to be free from racial discrimination." *Id.; see also Reid v. Evergreen Aviation Ground Logistics Enterprise, Inc.*, Civ. No. 07-1641-AC, 2008 U.S. Dist. LEXIS 118701, at *44-46 (D. Or. Jan. 20, 2009) (surveying decisions in the District of Oregon that are in agreement with *Battan*).

The bill referred to in *Battan* amended ORS 659A.885, which provides that a civil action is available to persons claiming a violation of any of a list of statutory subsections, including ORS 659A.040, workers compensation retaliation protection; ORS 659A.109, Oregon Rehabilitation Act retaliation protection; and ORS 659A.112, disability discrimination claim. H.R. 2260, 74th Leg. Assem., Reg. Sess. (Or. 2007); OR. REV. STAT. 659A.885 (2011). Applying the reasoning in *Battan*, that the expansion of the remedy provides for all compensation available under a wrongful termination claim, Arnold's wrongful termination claim under Oregon law is precluded because state statutes provide an adequate remedy.

### Conclusion

For the reasons stated, Pfizer's motion to dismiss (#68) is GRANTED as to Arnold's claims for retaliation under the Oregon Rehabilitation Act; workers compensation discrimination; and

wrongful discharge.  The motion is DENIED as to Arnold's claims for discrimination and retaliation under the ADA; discrimination under the Oregon Rehabilitation Act; and violations of the FMLA.

IT IS SO ORDERED.

DATED this 9th day of September, 2013.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge