IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KIMBERLY ARNOLD,

                Plaintiff,

    v.

PFIZER, INC.

                Defendant.

Case No. 3:10-cv-01025-AC

OPINION AND ORDER ON
POST-TRIAL MOTIONS

ACOSTA, Magistrate Judge

       Following a multi-day trial, the jury returned a verdict against Defendant Pfizer, Inc. ("Pfizer") and in favor of Plaintiff Kimberly Arnold ("Arnold") on her claims of discrimination and retaliation based on her disability under Title I of the Americans with Disabilities Act (ADA), 42 U.S. C. § 12101 *et seq,* and the Oregon Rehabilitation Act, Oregon Revised Statutes ("ORS") 659A.100 *et. seq.* Pending before the court are Pfizer's Motion for a New Trial (ECF No. 271), pursuant to FED. R. CIV. P. ("FRCP" or "Rule") 59, and Pfizer's Renewed Motion for Judgment as a Matter of Law ("JMOL") (ECF No. 272), pursuant to Rule 50(b). Arnold has filed her responses, as well as supplemental briefing at the court's request (ECF Nos. 277, 279, 298, & 299). Pfizer has filed replies to the motions, supplemental briefing, and supplemental authority (ECF Nos. 281, 282,

1 - OPINION AND ORDER ON POST-TRIAL MOTIONS

300, & 301). Following the completion of briefing, the court conducted oral argument on December 3, 2012. The issues are now sufficiently developed. For the reasons stated below, Pfizer's motions are denied.

*OVERVIEW AND TRIAL ISSUES*

Arnold began working for Pfizer in 1996 as a sales representative. In that role, Arnold was responsible for calling on physicians, hospitals, and other health care providers to sell and to explain the benefits of Pfizer's pharmaceutical products. Arnold was responsible for providing samples of Pfizer products to physicians, a process referred to as "sampling." Arnold was required to document the distribution of the samples on Starter Activity Forms, or "SAFs," and to record that information into Pfizer's computer system called Sherlock. The Prescription Drug Marketing Act also required that SAFs be documented. Arnold was an award-winning employee, receiving numerous sales awards and promotions, and surviving company-wide layoffs. For a period of time, Arnold's husband, Bill Arnold, also worked as a sales representative for Pfizer.

On September 16, 2005, Arnold was driving while on the job when she was struck by a FedEx delivery truck. As a result of her injuries, Arnold went on medical leave. When Arnold informed Pfizer that her doctor had released her to return to work in March of 2006, Pfizer's Medical Director Agatha Nody, M.D., informed Arnold she would need to complete an independent medical examination ("IME") to ensure her readiness to return. (Transcript, Day 1, 246-46.)[1] Dr. Nody was responsible for approving disability and scheduling IMEs. On March 15, 2006, plaintiff completed a functional capacity examination with Jeff Gerry M.D., who concluded that plaintiff was fit for light

---

[1] For clarity, page citations are to the sequential transcript page numbers. The transcript is separated by trial days (ECF Nos. 285-293).

duty work, with lifting restrictions of 20 pounds occasionally and 10 pounds frequently. On March 16, Arnold was examined by Thomas Anderson, M.D., who said that Arnold could not lift more than 25 pounds, but that due to the medications she was taking, she could not drive. (Transcript, Day 1, 248.)

Dr. Nody informed Arnold that she would exhaust her short-term disability benefits on March 17, 2006. Arnold expressed concern to Pfizer representative Carol Crane that Arnold's position had been posted as available on Pfizer's website, and that she intended to return to work full-time. On April 26, 2006, plaintiff underwent a third IME with Edward Grossenbacher, M.D., who found that Arnold could operate a motor vehicle, could lift 25 pounds, and was capable of returning to her position at Pfizer. Arnold returned to work after April 26, 2006, and was able to perform her job. (Transcript, Day 1, 249.)

In November of 2006, Arnold needed surgery for a herniated disk in her neck that stemmed from her 2005 on-the-job injury. Arnold again took medical leave beginning October 31, 2006. On February 27, 2007, Arnold emailed Dr. Nody that she would be ready to return on April 1, 2007, and inquired if another IME was necessary. On April 16, 2007, Dr. Anderson released Arnold to modified work beginning April 30, 2007. On May 4, 2007, Dr. Nody informed Arnold she would need a Fitness for Duty Evaluation ("FFD") and a Functional Capacity Evaluation ("FCE") before she could return. Arnold received both of these evaluations.

On May 29, 2007, Pfizer's Regional Human Resources Manager Julie Jennings informed Arnold by letter that Pfizer policy permitted it to reassign Arnold to a lower sales representative position, and to fill her vacant position. Arnold responded, contending that it was Pfizer's delays in scheduling the IME, FCE and FFD that were preventing her from returning. Pfizer took down its

posting of Arnold's position.    On June 18, 2007, Arnold attended another IME with Dr. Grossenbacher, who said that Arnold could safely operate a motor vehicle, noting that Arnold could take Vicodin as needed and had permanent lifting restrictions. (Transcript, Day 1, 256.)

In June of 2007, Arnold returned to work, with lifting restrictions.    Arnold informed her then supervisor, Mark Johnson, that she had lifting restrictions and that she still had back pain, particularly when bending.  Johnson suggested a different company vehicle, one with a "lift-back" to minimize bending.  Johnson rode with Arnold on a monthly basis after her return and had no problems with Arnold's driving or her completion of SAFs.  (Transcript, Day 1, 179-81.)  On February 6, 2008, Arnold sent her request for the lift-back vehicle to Dr. Nody.  Dr. Nody then asked Arnold for medical information from Arnold's pain specialist, Dr. Chiu.  (Transcript, Day 1, 262.) Arnold complied, providing Dr. Nody with a medical authorization release so that Dr. Chiu could provide his records concerning Arnold to Dr. Nody.  (Transcript, Day 1, 263.)  Upon reviewing Dr. Chiu's records, Dr. Nody discovered Arnold was taking Opana which Dr. Nody believed would impair Arnold's driving and Dr. Nody suspended Arnold from work.  Arnold coordinated with Dr. Chiu to get on a medication that would permit her to continue working.  Dr. Chiu prescribed Ultram to be taken only at night and Dr. Nody permitted Arnold to return to work.  After returning, Arnold performed very well, exceeding her sales goal.  On September 15, 2008, Pfizer provided Arnold a car with a lift gate.

In January of 2009, Pfizer undertook corporate restructuring, resulting in extensive layoffs. Johnson informed Arnold that she would retain her position, but would have a new supervisor, Darcy Small, as of February 1, 2009.  Arnold first met Small at a meeting on February 11, 2009.  Small was offended that Arnold stood during portions of the meeting to relieve back pain.  Arnold informed

Small about her 2005 injury, and that she would likely need additional surgery in the coming year. (Transcript, Day 2, 398.)

In March of 2009, Small received a request from Dr. Graham, a physician in Arnold's territory, for more Lipitor samples. On April 14, 2009, Small emailed Arnold and Arnold's coworker Nooshin Rahimi to see whether Dr. Graham had been sampled. At that time, Lipitor samples in certain doses were in short supply. Rahimi called Small and explained that she had given Dr. Graham Lipitor samples on April 13, 2009. (Transcript, Day 3, 698.) Small testified Rahimi confirmed that Arnold provided Dr. Graham samples the previous week, but none in March. (Transcript, Day 4, 834-35.) Arnold emailed a response to Small stating that Dr. Graham had been sampled three times. (Transcript, Day 4, 835.) Arnold had provided samples to Maureen Shenker, P.A., who worked under Dr. Graham's supervision. (Transcript, Day 2, 434.)

Small believed there was some discrepancy between information received from Arnold and Rahimi. Small did not inquire about the discrepancy with Arnold, but instead contacted Regional Director Lonni Lucherini and Julie Jennings. (Transcript, Day 4, 836.) Small then examined Arnold's starter activity reports and suspected that Arnold was form banking or falsifying when she was visiting physicians. (Transcript, Day 4, 836, 845.) Small shared her concerns with Jennings, and Jennings asked Jim Batura, Pfizer's Director of PDMA Compliance, to conduct an SAF investigation. (Transcript, Day 4, 845-46.) Batura was asked to identify any discrepancies between the paper SAFs and the electronic versions to determine if Arnold was form banking. Batura reviewed Arnolds SAFs from January 2008 to April 2009. (Transcript, Day 5, 1117.) Batura also examined starter activity for Arnold's coworkers Rahimi and Seaneen Rudnick-Manning. (Transcript, Day 5, 1103.) .

5 - OPINION AND ORDER ON POST-TRIAL MOTIONS

In April of 2009, Arnold, Small and Lucherini attended a national sales meeting in Las Vegas. At dinner one evening, Small inquired about Arnold's back and if she still needed additional surgery. (Transcript, Day 2, 437-38.)   Lucherini also inquired about her need for future need for surgery. (Transcript, Day 2, 439.)

On May 1, 2009, Batura emailed Small and stated that Arnold had intentionally changed the dates on certain SAFs and that there was reason to be concerned about the accuracy of Arnold's reporting. (Transcript, Day 5, 1080.) Batura said that Arnold could have been form banking, or could have poor administrative habits. (Transcript, Day 5, 1124.)

On May 11, 2009, Small accompanied Arnold for a half-day ride along to observe Arnold in the field. During the ride along, Small inquired about Arnold's injuries and her use of a heating pad, and Arnold informed her that she would need additional surgery. Small later emailed Johnson requesting Arnold's vacation and sick leave trackers.

On May 27, 2009, Small and Lucherini met with Arnold in person to ask about her work activity and the discrepancies on her SAFs. Small accused Arnold of trying to cover up a lack of work, but Arnold denied that she engaged in any misconduct. (Transcript, Day 3, 588.) Arnold was flustered, could not explain her absences, and admitted that she was not organized. (Transcript, Day 3, 588.)

Following her meeting with Small and Lucherini, Arnold went to see Sue Lewis, M.D. Arnold reported problems with concentration, focus, and difficulty completing tasks. Dr. Lewis diagnosed Arnold with Attention Deficit Disorder ("ADD") and prescribed Adderall. (Transcript, Day 2, 293, 297.) On June 2, 2009, Arnold informed Lucherini that her ADD may have affected her ability complete the SAFs appropriately and that medication had been prescribed. (Transcript, Day

2, 465.) Arnold informed Jennings that she had been diagnosed with ADD, and started medication. Arnold also discussed with Jennings that she had been accused of falsifying documents and inquired what help might be available. (Transcript, Day 2, 467-68.) Jennings responded that coaching is typically available. (Transcript, Day 2, 468.) On June 8, 2009, Dr. Lewis informed Dr. Nody that Arnold had been diagnosed with ADD and started medication, and that her diagnosis may affect her work capabilities. (Transcript, Day 2, 304.)

On June 17, 2009, Pfizer terminated Arnold's employment during a phone call for violating starter activity policies, including falsifying starter documents and attempting to cover-up lack of work activity.

Presentation of evidence at trial lasted eight days. Pfizer argued at trial that the decision to terminate Arnold occurred prior to June 2, 2009 and that it always terminates employees for form banking. Pfizer presented evidence that Arnold continued to use sedating medication without informing Dr. Nody. During deliberations, the court learned that the jury erroneously received plaintiff's exhibit list. The court instructed the jury that the exhibit list was not evidence and did not reflect any agreement by the parties regarding the evidence at trial. Pfizer moved for a mistrial, which the court denied.

The jury found in favor of Arnold on her claims for disability discrimination and retaliation, and for failure to provide reasonable accommodation under the ADA and state law. The jury awarded Arnold $2,700,660 in economic damages resulting from her termination, which it reduced by $2,025,495 because it found that Arnold continued to use sedating medication without informing Pfizer, in violation of Pfizer policy. The jury also awarded Arnold $500,000 in emotional distress damages.

7 - OPINION AND ORDER ON POST-TRIAL MOTIONS

*LEGAL STANDARDS*

## I.    Motion for New Trial

Pursuant to Rule 59, the court may grant a motion for new trial "on some or all of the issues" after a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(b).  A trial court may grant a new trial only if the verdict is against the clear weight of the evidence, and may not grant a new trial simply because the court would have arrived at a different verdict.  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010); *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *Silver Sage Partners Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).   "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusions, even if it is also possible to draw a contrary conclusion." *Pavao*, 307 F.3d at 918.

## II.    Renewed Motion for Judgment as a Matter of Law

Pursuant to FRCP 50(b), a renewed motion for JMOL should be granted "'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014)(quoting *Pavao*, 307 F.3d at 918). "The jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Id.*  In considering a renewed JMOL, the court must look at the entire evidentiary record, but the court may not weigh the evidence, and asks whether nonmoving party presented sufficient evidence to support the verdict. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).  The court must draw all reasonable inferences in favor of the nonmoving party and "'disregard all evidence favorable to the moving party that the jury is not

required to believe.'" *Escriba*, 743 F.3d at 1242-43 (quoting *Harper*, 533 F.3d at 1021); *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013).

*DISCUSSION*

I.    Motion for New Trial (ECF No. 271)

Pfizer asserts two bases for new trial: (1) the emotional distress damages of $500,000 are "grossly excessive" and unsupported by the evidence, warranting a new trial with the option of remittitur; and (2) Arnold's trial counsel's misconduct warrants a new trial because counsel violated pre-trial rulings and permitted exhibits to go to the jury that were not admitted at trial.

A.    *Emotional Distress Damages*

The court must defer to a jury's finding of the appropriate amount of emotional distress "damages unless the award is 'grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'" *McCollough v. Johnson, Rodenburg & Lauinger, LLC,* 637 F.3d 939, 957 (9th Cir. 2011)(quoting *Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 95 F.3d 1422, 1435 (9th Cir. 1996)).   Thus, the emotional distress damages award must be upheld unless it "shocks the conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1558 (9th Cir. 1988).

Remittitur is available to correct excessive verdicts. *Pershing Park Villas Homeowners Ass'n v. United Pacific Ins.*, 219 F.3d 895, 905 (9th Cir. 2000).   A trial court reviewing a damages award attacked as excessive must consider the evidence of damages in a light most favorable to the prevailing party. *Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir. 1987), *opinion amended on other grounds,* 817 F.2d 609 (9th Cir. 1987).   If the court concludes that a damages award is excessive, it may either grant the defendant's motion for a new trial, or deny the motion, conditioned upon the prevailing party's acceptance of a remittitur. *Silver Sage Partners,*

251 F.3d at 818. A trial court granting a motion for remittitur does not substitute its judgment for that of the jury, but instead reduces the judgment to the maximum amount sustainable by the proof. *D & A Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

Pfizer moves for new trial on the basis that jury's award of $500,000 in emotional distress damages is grossly excessive. Pfizer's primary contention is that Arnold suffered only "garden variety" emotional distress as opposed to "severe" emotional distress. Pfizer points out that in order to avoid waiving psychotherapist-patient privilege and to avoid Pfizer's requested second medical examination, Arnold submitted a declaration in which she stated that she suffered "ordinary emotional distress after I was terminated" and that she did not suffer any "specific psychiatric disorder." (Declaration of Kimberly Arnold in Support of Opposition to Defendant's Motion to Compel IME ¶ 4 (ECF No. 154)). According to Pfizer, Arnold was required to demonstrate that the emotional impact of her termination was severe – something beyond the typical upset of having lost a job – in order to recover such a sum for emotional distress damages. Pfizer also maintains that the evidence submitted at trial fails to support an award of $500,000, and that consequently the award must be based on closing rebuttal argument made by Arnold's counsel, Daniel Snyder, in which he suggested a sum of $500,000 to the jury. (Transcript, Day 8, 1913.) Alternatively, Pfizer seeks a new trial on damages, with the option of remittitur, suggesting that the emotional distress damages be reduced to $50,000.

The court is not persuaded by Pfizer's distinction between garden-variety emotional distress damages and severe emotional distress damages. Pfizer cites no controlling case law establishing a monetary cap on the garden-variety emotional distress damages a successful plaintiff may recover.

Arnold's admission that her emotional distress was "ordinary" does not mean that the jury could not find significant compensable emotional distress damages.

Additionally, the cases cited by Pfizer where emotional distress damages were reduced are distinguishable. For example, Pfizer relies upon *Longfellow v. Jackson County*, No. 06-cv-3043-PA, 2007 WL 682455 (D. Or. Feb. 28, 2007). In that case, the jury awarded $360,000 in emotional distress to the plaintiff on her claim of retaliatory discrimination. On a motion for new trial or remittitur, the judge reduced the emotional distress damages award to $60,000. However, in *Longfellow*, the plaintiff was on the job for only a short time, unlike Arnold, who had a 13-year career with Pfizer.

Furthermore, the emotional distress award in this case is clearly supported by the evidence produced at trial. Arnold was an award-winning salesperson who survived layoffs and continued to be a top-performer even after her on-the-job injury in 2005. Contrary to Pfizer's contention, Arnold's career as a pharmaceutical sales representative was ruined, as Arnold has been unable to find work in that field. Arnold testified that it took her five years to find new employment, that the job she found is not in the pharmaceutical field, and now works on a straight commission basis, in contrast with her salaried position at Pfizer. Arnold testified that her termination shook her confidence, caused anger, and disappointment, and that she felt embarrassed and humiliated. Arnold testified that she felt sick and panicked because she had been "ambushed" by Darcy Small and Lonnie Lucherini. Arnold's testimony was echoed by that of her husband, who testified that Arnold felt jumped, stunned and devastated, was stressed-out, and could not sleep. (Transcript, Day 3, 723-24.) Mr. Arnold testified that after being fired, Arnold was no longer motivated, became anti-social, would not leave the house, and was embarrassed. (Transcript, Day 3, 726-28.) *See McCullough*, 637

F.3d at 957-58 (upholding award of $250,000 in emotional distress damages based on testimony of plaintiff and clinical psychologist that plaintiff suffered headaches, paranoia, anxiety, stress, and conflict with others); *Passatino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 504, 513 (9th Cir. 2000)(upholding jury's $1,000,000 award for emotional distress based on testimony from plaintiff, husband, sister and that she sought counseling from a pastor).

Lastly, contrary to Pfizer's suggestion, there is no indication that the jury based its emotional distress damage award solely on Snyder's closing rebuttal argument that "in addition to the economic damages that we discussed in my initial statement to you, that you also award her $500,000 for her emotional distress as a result of this." (Transcript, Day 8, 1913.) To be sure, counsel are free to suggest amounts for emotional distress, but the jury must make its determination based on the evidence. To that end, the jury was explicitly instructed not to consider counsel's arguments as evidence. *See* (Preliminary Jury Instructions "What Is Not Evidence" ("statements and arguments of the attorneys" are not evidence and should not be considered)).[2] There is no indication here, and Pfizer has presented no evidence or argument, that the jury did not follow the court's instructions. *E.g., Weeks v. Angelone*, 528 U.S. 225, 234 (2000)("A jury is presumed to follow its instructions."); *Ho v. Carey*, 332 F.3d 587, 594 (9th Cir. 2003)(the court "presume[s] that a jury follows the trial court's instructions").

Therefore, based upon the evidence presented at trial, the jury's award is supported by the evidence, and an award of $500,000 does not "shock the conscience." The award is not based on

---

[2]Pursuant to the court's practice, the jurors were each provided a written "packet" of preliminary instructions for their review and consideration throughout the trial and during deliberations. Included in the packet were instructions "What Is Evidence" and "What Is Not Evidence" based on Ninth Circuit Model Civil Jury Instructions 1.6 and 1.7 that the parties agreed to in their joint jury instruction submission. (ECF No. 198). The court's preliminary instructions dated May 21, 2014, are appended to this Opinion and Order.

speculation and guesswork, but instead is based on the jury's valuation of Arnold's emotional distress. Therefore, Pfizer's motion for a new trial with an option for remittitur on this basis is denied.

B.    *Attorney Misconduct*

A new trial is warranted on the ground of attorney misconduct during the trial where the "flavor of misconduct . . . sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Standard Oil Co. of California v. Perkins*, 347 F.2d 379, 388 (9th Cir. 1965); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000); *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995).

Pfizer moves for a new trial based on Snyder's conduct during the trial and his carelessness in failing to remove documents from Arnold's exhibit binder. Pfizer contends that Snyder's misconduct permeated the trial in the following ways: (1) Snyder mentioned that Dr. Turco was retained by Pfizer; (2) Dr. Lewis mentioned that Dr. Turco was retained by Pfizer; (3) Snyder mentioned that Pfizer had unlimited resources, and noted in rebuttal that Pfizer was "very rich" and "different from you and me"; (4) Snyder alluded to the fact that Pfizer was from out of town; and (5) Snyder permitted exhibits not admitted into evidence to go to the jury. Pfizer argues that when Snyder's actions are taken together, Snyder's misconduct was so extensive it "permeated" the entire trial, necessarily prejudicing the jury against Pfizer, warranting a new trial.

Arnold responds that her attorney's actions did not run afoul of any of the court's pretrial rulings. Additionally, Arnold argues that with respect to the exhibit binders, Snyder did not engage in misconduct because Snyder honestly believed the Courtroom Deputy was responsible for

removing the extraneous material from the parties' exhibit binders, and that Pfizer has not demonstrated prejudice resulting from jury's receipt of the extraneous evidence.

      1.    *Dr. Turco retained by Pfizer*

Prior to trial, Pfizer designated Ronald N. Turco, M.D., as an expert and he conducted a psychiatric examination of Arnold on October 24, 2011. The following day, Dr. Turco prepared a report of his examination (the "Turco report"). Nearly two years later, on October 22, 2013, Pfizer informed the court that Dr. Turco had destroyed his entire file concerning Arnold, including notes, test results, scoring, and documents that Dr. Turco had reviewed when preparing his report. (Memorandum in Support of Pfizer's Motion to Compel Second IME, 1-2 (ECF No. 148)). Pfizer also represented that Dr. Turco had no independent recollection of his October 2011 examination of Arnold. *Id.* Therefore, due to Pfizer's "lost confidence" in Dr. Turco, Pfizer sought to designate a new expert witness, Marc A. Cohen M.D., to conduct a second IME of Arnold, and moved to exclude all references to Dr. Turco, his report, and to exclude him as a witness. (ECF Nos. 147 & 148). The court denied Pfizer's Motion to Compel a Second IME (ECF No. 159), and in the court's Order on Motions in Limine, excluded all references to Pfizer's choice not to designate Dr. Turco as an expert as irrelevant and unfairly prejudicial to Pfizer. (Order On Motions in Limine, 42 (ECF No. 235)). The court also prohibited any references to the issue of the lost or destroyed materials. *Id.* Prior to trial, Arnold proposed calling Dr. Turco as a rebuttal witness and using the Turco report as an exhibit, designating it Exhibit 153. (Exhibit List (ECF No. 193), Witness Statement, 59 (ECF No. 194)). Pfizer objected. Prior to trail, the court ruled that Arnold could call Dr. Turco as a rebuttal witness, and made the following ruling on Exhibit 153:

**RULING: SUSTAINED in part; OVERRULED in part.**

At the November 5, 2013, hearing, the court found that Dr. Turco's report "is hearsay, but that he can use it to refresh his recollection and testify from it certainly." Plaintiff concedes the report may not go to the jury but wishes to use the report to refresh Dr. Turco's memory and to cross-examine Dr. Cohen. Plaintiff may use the report to refresh Dr. Turco's memory. Plaintiff is limited to Dr. Turco's testimony in its cross-examination of Dr. Cohen, and may reference Dr. Turco's report in that regard only to the extent Dr. Cohen considered it in reaching his own conclusions.

(Order on Objections to Exhibits, 8-9 (ECF No. 238); *accord* Order on Objections to Witnesses, 5, 7 (ECF No. 236)).    Ultimately, Arnold did not call Dr. Turco as a rebuttal witness at trial, but did use the Turco report to refresh Dr. Cohen's recollection during cross-examination.

In its current Motion, Pfizer argues that Snyder purposefully mentioned that Dr. Turco was retained by Pfizer on one occasion, violating the court's pretrial rulings. Pfizer complains about Snyder's question to Dr. Cohen on cross-examination on Day Seven of trial:

[Mr. Snyder.]    And after this lawsuit was filed, Pfizer sent Ms. Arnold to attend an examination by Dr. Turco; correct?

Mr. Hood:    Your Honor?

The Court:    Yes.

Mr. Hood:    Subject to the motion in limine.

The Court:    Sustained.

(Transcript, Day 7, 1609.)    During a recess on Day Seven shortly after Pfizer's objection, Pfizer again complained about Snyder's comments and questions; the court warned Snyder that he was snipping at the edges of the court's pretrial rulings and advised him that the reference to Dr. Turco being hired by Pfizer was "within the umbrella or spirit of my ruling." (Transcript, Day 7, 1642.) No further instances of improper questioning related to Dr. Turco occurred.

The court's pre-trial rulings clearly provided that Arnold was not to reference the fact that Pfizer hired Dr. Turco, and Snyder's question ran afoul of those rulings. *See, e.g.,* (Order on Objections to Witnesses, 7 (ECF No. 236)). Yet, when Pfizer objected to Snyder's improper question, the court sustained the objection, and the court's further cautioning of Snyder during the recess curtailed any further improper questions by counsel. Moreover, the jury was specifically instructed that questions from the attorneys are *not* evidence, and the court must presume that the jury followed that instruction. *Rudy-Glanzer,* 232 F.3d at 1270 (denying motion for new trial where trial court sustained objections to counsel's questions that were "out of bounds"). Pfizer has failed to demonstrate how this solitary improper question to which the court sustained objection, constitutes misconduct.

Pfizer also complains that on Day Two of trial, Snyder committed misconduct by failing to properly inform Dr. Lewis when testifying on cross-examination that Dr. Lewis could not mention that Dr. Turco was hired by Pfizer. During her testimony, Dr. Lewis stated that prior to testifying, she reviewed her own deposition transcript, her records, as well as chart notes and letters authored by other physicians:

> [Mr. Hood.]    And who were those physicians?
>
> A.        Those are the physicians that Pfizer sent Ms. Arnold to for expert
>            opinion. Dr. Turco, I believe, and was it Dr. Friedman?

(Transcript, Day 2, 308-309.)

Pfizer did not object to Dr. Lewis's testimony on Day Two. Failing to object to the alleged misconduct requires an even greater showing of prejudice that Pfizer clearly has not established. *Settlegoode v. Portland Public Schools,* 371 F.3d 503, 517 (9th Cir. 2004)(failing to object to alleged

misconduct requires demonstrating plain error). Even when Dr. Lewis's testimony is viewed in combination with Snyder's improper question on Day Seven, the court concludes that Pfizer has not demonstrated that these two isolated references to Pfizer hiring Dr. Turco sufficiently permeated the entire eight days of evidence to justify a finding of prejudice warranting a new trial.

### 2.    *Pfizer's resources and out-of-town references*

Pfizer argues that Snyder's references to Pfizer being from out of town, that it has unrestrained resources, and is "different from you and me" also constitute misconduct. Pfizer contends that it was "home-towned" during trial. *See Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 539 (2nd Cir. 1992)(noting that attempts to create feelings of hostility against out-of-state parties are "out of place in a federal courtroom").

However, close examination of the five instances Pfizer identifies fails to demonstrate any kind of home-town or regional bias. Instead, the instances largely relate to where depositions occurred: two instances refer to taking or defending a deposition in Portland (Transcript, Day 5, 1001; Day 7, 1482), one refers to taking a deposition in Seattle (Transcript, Day 5, 1158), one fails to specify a city, but refers to a witness going "back home" (Transcript, Day 7, 1609), and the final instance merely refers to a deposition being taken by defense counsel's counterpart (Transcript, Day 5, 1128). Indeed, the cities identified are Portland and Seattle, clearly locations within the region. Pfizer did not object to the questions at the time, but later complained to the court during recess (at the same time that it complained that Snyder was improperly referring to Dr. Turco) that Snyder was indirectly referring to Pfizer's lawyers as being from out of town. (Transcript, Day 7, 1642.) As noted, the court cautioned Snyder that his "oblique references" were not specifically excluded by the

motions in *limine*, but that Snyder should not be "eager to misconstrue any ambiguities." (Transcript, Day 7, 1642-43.) No further alleged improper references occurred.

The court is not persuaded that these few, passing references to depositions occurring in Portland and Seattle created a greater regional or home-town bias against Pfizer. Indeed, the five relatively innocuous instances occurred over the course of an eight-day trial with over 1,900 pages of transcript. Additionally, the court's cautioning of Snyder curtailed any further alleged improper remarks. Moreover, Snyder's questions were infrequent and were not combined with an "us versus them" type of argument. *Compare Pappas*, 963 F.2d at 539 (new trial granted where in-state counsel highlighted regional differences between the parties, trial judge overruled objection to continued biased comments by counsel and trial judge did not give a curative instruction). Pfizer cites no controlling case law where a new trial was ordered under circumstances similar to those in this case. Thus, Pfizer has not demonstrated misconduct or that counsel created any type of bias against Pfizer which would require a new trial.

Pfizer also complains that Snyder alluded to Pfizer as "very rich" and "different than you and me." This simply is not misconduct warranting a finding of prejudice. Snyder's statements arose during closing rebuttal argument in reference to an F. Scott Fitzgerald piece that counsel specifically directed at Dr. Cohen. (Transcript, Day 8, 1911-12.) There, Snyder stated that Pfizer had put "considerable resources" into the case by paying Dr. Cohen $90,000 in expert witness fees. (Transcript, Day 8, 1912.) Pfizer admitted at oral argument on its present motions that amount of money Pfizer paid to Dr. Cohen was a proper line of questioning, and also conceded that the sum was indeed considerable. Again, the jury was instructed that counsel's arguments are not evidence, and the court must presume this instruction was followed. *Rudy-Glanzer*, 232 F.3d at 1270. Given

that Pfizer admits that questioning and commenting on the sum paid to Dr. Cohen was fair game, and that the statements occurred during closing rebuttal argument, these statements do not contribute at all to the "permeation" Pfizer claims justifies a finding of prejudice to set aside a jury verdict.

Thus, Pfizer has failed to demonstrate that any of Snyder's conduct – when viewed in isolation or cumulatively – permeated the entire proceeding and prejudiced the jury. Over the course of the multi-day trial, the court cannot conclude that the alleged improprieties committed by Snyder were sufficiently pervasive and prejudicial to warrant issuing a new trial on this basis. *See Rudy-Glanzer*, 232 F.3d at 1270-71 (finding that sustained objections and limiting instructions to jury in response to counsel's improper line of questioning could not meet high "permeation" standard necessary to invalidate trial verdict).

3.    *extraneous evidence*

Pfizer contends that Snyder's carelessness and misconduct permitted several exhibits not admitted as evidence to reach the jury.

At the conclusion of the trial, consistent with its typical practice, the court directed counsel to:

> make sure that the exhibits in the exhibit binders conform with the exhibits that have been received in evidence, which is to say they have been used in trial, during the course of trial, either through openings or closings or because witnesses were asked or shown those exhibits.
>
> I have a list. I believe [the Courtroom Deputy] has a list. . . .
>
> So you should, each of you, check your respective lists with [the Courtroom Deputy's] to confirm that you know which exhibits are in and out, because only the exhibits that were referred to in trial will go to the jury.[3]

_____

[3]This is consistent with the court's instructions at the pretrial conference on May 21, 2014. At the pretrial conference, the court informed counsel that exhibits are preadmitted, but that not every exhibit gets used at trial, and that exhibits not used would not go to the jury.

(Transcript, Day 8, 1917-18.)

After the jury began deliberating, it was learned that Arnold's exhibit list was erroneously included in plaintiff's exhibit binder that was provided to the jury for deliberations. The court instructed the jury that the exhibit list was not agreed-upon evidence and should not be considered, and denied Pfizer's motion for a mistrial. After the verdict, Pfizer discovered that the following exhibits also erroneously remained in plaintiff's exhibit binder: 8, 21, 44, 50, 82, 92, 110, 141, and 153.

Pfizer argues that Attorney Snyder's failure to remove the non-admitted documents from plaintiff's exhibit binder is further evidence of attorney misconduct. Snyder concedes that several exhibits reached the jury that should not have, but Snyder has attested that he honestly believed that the Courtroom Deputy was responsible for reviewing the exhibit binders and removing non-admitted exhibits before they reached the jury. (Declaration of Daniel Snyder in Opposition to Motion for New Trial, 2-4 (ECF No. 280)). Having carefully reviewed the record, the court concludes that Snyder's failure to remove the documents was not deliberate.

There is no evidence that Snyder intentionally sent non-admitted documents into the jury room. Indeed, Pfizer's counsel, Nicole Shaffer, also admits that she thought that the Courtroom Deputy would be reviewing the binders to ensure only admitted documents went into the jury room. (Declaration of Nicole Shaffer In Support of Defendant's Reply to Motion for New Trial, 2 (ECF No. 282)). Such a situation is more correctly analyzed under juror misconduct, not attorney misconduct. The court requested additional briefing from the parties concerning the appropriate standard, and discusses the issue of juror misconduct and extraneous evidence separately.

C.      *Juror Misconduct and Extraneous Evidence*

The Ninth Circuit distinguishes between two types of juror-misconduct cases. *United States v. Rosenthal*, 454 F.3d 943, 949 (9th Cir. 2006)(citing *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 906 (9th Cir. 2000)).    The first type of juror misconduct concerns extraneous evidence which "involve not only the introduction of 'evidence' *per se* but the submission of extraneous information (e.g., a file or dictionary) to the jury." *Id.* (internal quotation omitted). The party seeking a new trial must show by a preponderance of evidence that the jury was exposed to extraneous evidence. *United States v. Caro-Quinero*, 769 F. Supp. 1564, 1574 (C.D. Cal. 1991).    In an extraneous evidence case, the court grants a new trial "if there is a reasonable possibility that the material could have affected the verdict." *Rosenthal*, 454 F.3d at 949 (internal quotation omitted).    The party opposing a new trial has the burden to demonstrate the absence of prejudice.  *Id.*  The presence of extrinsic evidence does not always require a new trial, and the court must conduct a searching review of the "circumstances and nature of the material to ensure that jurors deliberate without undue outside pressure or influence." *Id.*

The second type of juror misconduct case involves *ex parte* contacts with a juror that "do not include the imparting of any information that might bear on the case." *Id.* (internal quotation omitted).  *Ex parte* contacts "do not pertain to any fact in controversy or any law applicable to the case." *Id.* (internal quotation omitted).  In an *ex parte* contacts case, the court must hold a fair hearing if it finds a reasonable possibility of prejudice.  Unless the *ex parte* contact is inherently coercive, the moving party is not entitled to a new trial without demonstrating "actual prejudice." *Id.*  It is clear this case involves an issue of jurors receiving extraneous evidence, not one involving *ex parte* juror contact.

"Where extraneous information is imparted, as when papers bearing on the facts get into the jury room without having been admitted as exhibits, or when a juror looks things up in a dictionary or directory, the burden is generally on the party opposing a new trial to demonstrate the absence of prejudice, and a new trial is ordinarily granted if there is a reasonable possibility that the material could have affected the verdict." *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 906 (9th Cir.2000). The Ninth Circuit instructs the trial court to consider the following factors in determining whether there is a reasonable possibility that extrinsic evidence affected the verdict: (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008); *United States v. Montes*, 628 F.3d 1183, 1188 (9th Cir. 2011). Generally, a court will not order a new trial unless the juror misconduct "relates directly to a material aspect of the case," and there is a "direct and rational connection" between the extrinsic information and the verdict. *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir. 1981); *Montes*, 628 F.3d at 1190. In order to deny the motion for new trial, the court must be able to conclude that the extrinsic evidence was "insufficiently prejudicial given the issues and evidence in the case." *Rosenthal*, 454 F.3d at 949; *Montes*, 628 F.3d at 1188.

    1.    *the "timeline"*

During the jury's deliberations, the court learned that the jury had received an extraneous exhibit when the jury foreperson sent a note to the court requesting copies of the "timeline." The

22 - OPINION AND ORDER ON POST-TRIAL MOTIONS

document, plaintiff's exhibit list, was located in the front of plaintiff's exhibit binder and identified

Arnold's exhibits by number and date, and contained a brief description of the content of the exhibit.

(Transcript, Day 9, 1925.)  The court advised counsel of the jury's request and of the court's intent

to offer a curative instruction because the information on the document appeared cumulative.

Arnold's counsel acknowledged that the document was inadvertently included in his binder.

(Transcript, Day 9, 1927-28.)  The court gave the jury the following curative instruction:

> The list was one generated by the plaintiff, not by the defendant and not in concert with the defendant.  It's not a joint list.  That reflects only the plaintiff's exhibits and reflects only the plaintiff's description of the exhibits she intended to present at trial, and many of which were, in fact, presented at trial.  And I wanted to correct any possible misunderstanding that any of you might have formed that it was either a timeline or that it was a timeline prepared and submitted jointly by the parties.
>
> It is neither of those things.
>
> I know that at least some of you did not see this document.  Others of you might have. [The foreperson] probably saw it, at least, in passing, because she wrote the note.
>
> In any event, you shouldn't consider it as reflecting any agreement, whether as to dates, the completeness of dates, the completeness of events, or description of those exhibits, as any representation or agreement by the parties as to those matters. And that was what I wanted to make sure you understood.

(Transcript, Day 9, 1929-30.)  Pfizer then argued it was prejudiced by the jury having seen the

timeline and moved for a mistrial, which the court denied.  (Transcript, Day 9, 1931); (Minutes of

Proceedings (ECF No. 263)(attaching the timeline)).

Pfizer maintains that the timeline described documents in argumentative terms, and therefore

presented a biased selection and emphasis of the evidence.  Pfizer contends that the fact that the jury

requested copies of the timeline demonstrates that the jury found Arnold's description of events

helpful, and that it was therefore prejudiced.   According to Pfizer, there is a reasonable possibility that the timeline could have impacted the verdict, and thus a new trial should be ordered.

Arnold responds that there is no reasonable possibility that the timeline prejudiced the jury because the court gave a curative instruction.   Arnold maintains that the curative instruction effectively ameliorated any potential for prejudice, and that the information on the timeline was sufficiently cumulative, and therefore, the jury was not prejudiced.

The court carefully examined the exhibit list prior to instructing the jury and concluded the information contained was cumulative to that already presented at trial.  Having again reviewed the exhibit list, the court reaches the same conclusion.  The descriptions of the exhibits contained on the exhibit list do not differ from the exhibits themselves, or from the questions asked by Snyder during trial or in his opening, closing, or rebuttal arguments.  Pfizer does not contend that any specific entries are prejudicial or affected any material aspect of the case.  Furthermore, there is no suggestion that the court's curative instruction did not adequately cure any potential for prejudice.  "A jury 'is presumed to follow the instructions given to it,' and the presumption is a strong one." *Escriba,* 743 F.3d at 1247 (quoting *United States v. Heredia,* 483 F.3d 913, 923 (9th Cir. 2007)(*en banc*)).  *See also Williams v. Sysco San Francisco, Inc.,* No. C 10-03760 MEJ, 2013 WL 6623180, *5 (N.D. Cal. Dec. 16, 2013)(parties' joint exhibit list going to the jury was not prejudicial therefore did not warrant new trial).  Because the court gave a limiting instruction to the jury that the jury is presumed to have followed, any potential that Pfizer was prejudiced was curtailed.  The court concludes that Arnold has demonstrated there is no reasonable possibility of prejudice, and a new trial is not warranted on this basis.

2.    *Exhibit 153 – the Turco report*

After the entry of the verdict, Pfizer learned that Exhibit 153, the Turco report, was in plaintiff's exhibit binder. Dr. Turco's report, although used during cross-examination of Dr. Cohen, was not admitted as evidence and therefore is extraneous evidence. Pfizer has demonstrated by a preponderance of evidence that Exhibit 153 was present during jury deliberations because the exhibit remained in plaintiff's exhibit binder that was in the jury room. Examining the factors for determining whether Pfizer has suffered prejudice from juror misconduct, it is undisputed that Exhibit 153 was received by the jury through an honest mistake, and that the jury had the report for the duration of its deliberations. It is unknown whether the jurors saw Exhibit 153, discussed it, or relied upon it in whole or in part when reaching the verdict.

The parties, correctly, did not request a hearing concerning the effect of Dr. Turco's report reaching the jury. While the court could hold a hearing to inquire whether the jurors saw Exhibit 153, the court could not inquire about how Exhibit 153 impacted their verdict. *See* FED. R. EVID. 606(b)(noting that jurors may testify about extraneous evidence reaching the jury, but may not testify about juror's mental process in reaching verdict); *Estrada*, 512 F.3d at 1237 (jurors may not testify as to subjective effect of extrinsic evidence in reaching verdict); *Montes*, 628 F.3d at 1189 (determining that district court could properly did not hold an evidentiary hearing because it would have impermissibly inquired about the subjective effect of the extraneous information on the jury's deliberations). Given that a hearing would be of limited value, and that it is undisputed that the jury had the extraneous exhibits for the duration of its deliberations, the court declined to hold a hearing.

At oral argument, Pfizer contended that the jury's receipt Dr. Turco's report stating that Arnold was "honest in her presentation" was highly prejudicial. Pfizer argues that its inability to respond to Dr. Turco's inadmissible hearsay vouching of Arnold's credibility creates a reasonable possibility that the jury was prejudiced against Pfizer. In its briefing, Pfizer contends that it was prejudicial for the jury to know that Pfizer retained Dr. Turco, yet failed to designate him as an expert at trial. According to Pfizer, the jury could presume, without knowing why they used Dr. Cohen at trial instead of using Dr. Turco, that it was trying to bury the Turco report.

The allegedly prejudicial portion of Exhibit 153 occurs at page seven[4] where Dr. Turco provides his impression of Arnold, including that:

> she is honest in her presentation. Whether her perceptions are correct is another issue. There is no diagnosis noted with regard to Posttraumatic Stress Disorder which of course is the result of some form of severe emotional distress. There is also no indication of ADD. I have also noted that simply because a medication improves one's psychological functioning, it is not diagnostic of a particular condition. . . . [S]he does have substantial somatic concerns which are understandable, the MMPI I administered revealed elevations in four of the clinical scales including hypochondriasis, depression, hysterical magnification, and anxiety. The "L" scale is elevated and this is usually a defensive finding. However, I would state that she was able to concentrate quite well on 567 difficult questions and she also responded honestly. She certainly is evidencing some degree of social avoidance and a degree of psychological symptoms. The hysterical magnification is noted with regard to causing the overall elevation of the clinical scales.
>
> *In summary, my perspective of the situation is that it is primarily a legal issue rather than a medical or psychiatric one. . . . Certainly her perspective should be given credence with regard to her understanding of being unfairly terminated in the work place. This however is not a psychiatric issue. Considering the fact that Ms. Arnold's overall presentation, at least in the context of my examination, is an honest*

---

[4] The first six pages of Dr. Turco's eight-page report consist of Arnold's medical history and the purpose of the examination. Pfizer did not argue at the December 3, 2014 hearing that these portions of the report were prejudicial. The court concludes that these portions of Exhibit 153 are cumulative of other evidence, including but not limited to Arnold's testimony, and that of her physicians.

26 - OPINION AND ORDER ON POST-TRIAL MOTIONS

> *one, her complaints should be taken quite seriously and evaluated in the most*
> *intensive way.*

(Declaration of Samantha Hoffman in Support of Defendant's Motion for New Trial ¶ 9 & Ex. G at

7 (ECF No. 271-2)(emphasis added)).  Dr. Turco diagnosed Arnold with an Adjustment Disorder,

with mixed-emotional features, including relatively mild Depression and Anxiety, but not ADD.  Dr.

Turco also noted that Arnold is capable of working on a full-time basis without any psychiatric

restrictions.  *(Id.* at 8.)

Arnold argues that the jury was not prejudiced by receiving Dr. Turco's report because it

undermines her claim that she suffered from ADD.  Arnold contends that Dr. Turco's report provides

only cumulative information to that provided by Dr. Cohen on cross-examination, and therefore, its

receipt by the jury was not prejudicial.

The court has carefully reviewed all of Dr. Cohen's testimony and compared it with Turco's

report.  On direct, Dr. Cohen discussed his diagnosis of malingering, meaning that Dr. Cohen

believed Arnold intentionally exaggerated her symptoms for the purposes of litigation or financial

compensation. (Transcript, Day 7, 1596-97.)  Dr. Cohen testified that he reviewed information from

Dr. Friedman, who also found that Arnold was exaggerating her symptoms.  (Transcript, Day 7,

1600.)  On direct, Dr. Cohen also testified that he did not find any evidence to suggest that Arnold

suffers from ADD.  *(Id.)*  On cross-examination, Dr. Cohen stated that he had reviewed the report

prepared by Dr. Turco.  (Transcript, Day 7, 1609.)  Dr. Turco was asked about various aspects of

the Turco report, including that Arnold reported being scattered and experienced depression, anxiety,

and helplessness.  (Transcript, Day 7, 1611-12.)  On cross-examination, Dr. Cohen was asked

specifically about Dr. Turco's description that Arnold was "honest in her presentation." (Transcript,

Day 7, 1612.)  Pfizer did not object to this question.  (*Id.*)  Arnold's counsel inquired whether Dr.

Cohen understood that Dr. Turco found Arnold "responded honestly" to questions about Dr.

Friedman's MMPI.  (Transcript, Day 7, 1613.)  Dr. Cohen agreed that those were terms that Dr.

Turco used.  (Transcript, Day 7, 1612-13.)  On redirect, the following exchange took place:

> BY MR. HOOD:
>
> Q:    Dr. Cohen, is it possible for someone to be honest in their presentation but,
>       nevertheless, be dishonest or dissembling?
>
> A:    First, I think it's important to explain one detail.  Psychiatrists are not mind
>       readers.  We're not able to determine if someone is telling the truth or not.
>
>              What we can do, though, is look at behavior and say, "Is that
>       consistent from one situation – from one context to another, and how do we
>       attribute the discrepancies of the behavior, if they exist?"  But we are not lie
>       detectors.  We're not human lie detectors.  And no one can determine if one
>       is being honest or dishonest by just self-report.  Someone can come across as,
>       quote, credible and yet still provide discrepancies and be exaggerating and
>       malingering symptoms for their own personal gain.  I have no way to
>       determine why the descriptor of her being honest was used or what it means.
>       In a forensic evaluation, in my opinion, it has no place.

(Transcript, Day 7, 1635-36.)  Dr. Cohen later was asked on redirect to explain his diagnosis of

malingering.  Dr. Cohen responded that there were reports suggesting that Arnold was exaggerating

her symptoms to medical providers, including to Dr. Friedman, and that Dr. Cohen saw other

examples of exaggerating and misleading behavior in the materials he reviewed.  (Transcript, Day

7, 1637-38.)

Based on the record, the court concludes that Dr. Turco's statement that Arnold was "honest

in her presentation" and "reported honestly" is duplicative of admissible evidence the jury already

received through Dr. Cohen's testimony, and the possibility for prejudice is reduced.  *See Hughes

v. Borg*, 898 F.2d 695, 701 (9th Cir. 1990)(in habeas corpus case, extraneous police report did not

prejudice jury because it was duplicative of other trial testimony; extraneous affidavit was not prejudicial in light of other evidence of overwhelming guilt).  Additionally, contrary to Pfizer's contention, it not only had the opportunity to refute the statements concerning Arnold's credibility, it did so with a lengthy discussion during its redirect of Dr. Cohen, further reducing any possibility of prejudice.  And, looking at the remainder of the Turco report, Dr. Turco did not diagnose Arnold with ADD, found that she did not suffer from PTSD, and that she suffered from hysterical magnification of her symptoms, information helpful to Pfizer's theory of the case.  For all these reasons, the court finds the jury's receipt of the Turco report is insufficiently prejudicial given the issues and evidence in the case.  The court concludes there is no direct and rational connection between the statement that Arnold was honest in her presentation and  the jury's verdict. Accordingly, the court finds there is no reasonable possibility that Pfizer was prejudiced by the jury's inadvertent receipt of Exhibit 153, and the motion for new trial on this basis is denied.  *See Montes*, 628 F.3d at 1190-91; *Bagnariol*, 665 F.2d at 888.

3.  *Exhibits 8, 21, 44, 50, 82, 92, 110, and 141*

While it is undisputed that Exhibits 8, 21, 44, 50, 92, 110, and 141 reached the jury for the duration of jury deliberations, the court is convinced that Pfizer was not prejudiced by the jury's receipt of these exhibits, and a new trial is not warranted.[5]  As Arnold correctly highlights, each of these exhibits was submitted as part of Arnold's pretrial submission, Pfizer did not object to any of these exhibits in its pretrial motions, and the court did not limit their use in any fashion in its pre-trial rulings.  (Order on Motions in Limine (ECF No. 235)).  Although the court's practice is to remove exhibits not admitted into evidence at trial from the exhibit binders prior to giving them to the jury,

---

[5]Exhibit 82 is not in plaintiff's exhibit binder; therefore Pfizer has not demonstrated by a preponderance of evidence that it was received by the jury.

all were preadmitted without any objection from Pfizer. This shows a lack of prejudicial effect. Moreover, as detailed below, the same or similar information was introduced by other exhibits or testimony, and thus Arnold has demonstrated an absence of prejudice to Pfizer by the jury's receipt of Exhibits 8, 21, 44, 50, 92, 110, and 141.

Exhibit 8 contains wage and salary information. The information in Exhibit 8 describes Arnold's base pay in 2004 as $89,600, that she received a $13,154 bonus, and benefits valued at $25,380. Exhibit 47 is Arnold's performance review, and it shows similar information as that in Exhibit 8; Arnold's base salary for the years 1996 to 2007. On page 5, Exhibit 47 shows Arnold's base pay in 2004 as $89,600. Arnold testified on Day One to similar information about her salary ranges, bonuses, and benefits. (Transcript, Day 1, 214-16.) Because the information is cumulative, the jury's receipt of Exhibit 8 is harmless.

Exhibit 21 contains cumulative or duplicative information to that in Exhibit 20. Exhibit 21 is a check-the-box form prepared by Dr. Anderson, indicating that Arnold was not able to return to work. This same information was provided in narrative form in Exhibit 20. Receipt of Exhibit 21 by the jury is harmless.

Exhibit 44 is an email exchange between Jenny Mark and Michelle Dalimot concerning Arnold's return-to-work status on June 21, 2007. In the email, Dalimot references a Unival IME report. The Unival IME report is Exhibit 42, and a corresponding check-the-box form is Exhibit 43. Arnold's request to Dr. Nody as to whether an IME was required for her to return to work in the spring of 2007 is Exhibit 31. Arnold testified about her emails to Dr. Nody, her return to work process in 2007, and the contents of Exhibits 42, 43, and 31 on Day One of trial. (Transcript, Day 1, 253-57.) Exhibit 44 contains cumulative information and thus, its receipt by the jury is harmless.

Exhibit 50 contains Pfizer's Retirement Annuity Plan Summary Plan Description dated January 2008. The same document appears in Exhibit 157A. Clearly, the jury's receipt of this document is harmless error.

Exhibit 92 explains the criteria for obtaining raises. It is undisputed that Arnold always received raises. Because this was not an area of dispute at trial, the likelihood of it impacting the outcome on the verdict is minimal. Arnold has demonstrated that the jury's receipt of this exhibit is harmless.

Exhibit 110 is an email chain from Arnold to Darcy Small to Mark Johnson concerning Arnold's illness or sick leave during the first quarter of 2009. It is a duplicate of Exhibit 244 and consequently, its receipt by the jury is harmless.

Exhibit 141 is a copy of Julie Jennings telephone records. Exhibit 141 was displayed to the jury during direct examination of Arnold on Day Two of trial. (Transcript, Day 2, 467-69.) Therefore, Exhibit 141 is cumulative of Arnold's testimony, and duplicative of the information shown to the jury. Arnold has demonstrated its receipt by the jury is harmless.

In summary, the court denies Pfizer's Motion for New Trial (ECF No. 271). The court concludes that a new trial is not warranted on Pfizer's assertion that Arnold's emotional distress damages were grossly excessive, or that Arnold's counsel's misconduct or juror misconduct prejudiced the jury against Pfizer.

II.    Pfizer's Renewed Motion for Judgment as a Matter of Law (ECF No. 272)

Pfizer renews its Motion for JMOL pursuant to Rule 50(b), contending there was insufficient evidence to support the jury's verdict and that it is entitled to judgment because: (1) Arnold is not a qualified individual with a disability; (2) Pfizer would have made the same decision regardless of

Arnold's disability; and (3) Pfizer was not required to provide a reasonable accommodation for Arnold's alleged disability. Defendant's Renewed Motion for Judgment as a Matter of Law, 3 (ECF No. 272). Alternatively, Pfizer moves for a new trial pursuant to Rule 59 on the same grounds.

Arnold responds that she presented sufficient evidence from which the jury could conclude that her disability was a motivating factor in her termination on both grounds: her back and neck issues and her ADD. Arnold does not dispute that driving was an essential function of her job, and maintains that she presented ample evidence from which the jury could conclude that she was was able to perform that essential function. Arnold also argues that she presented substantial evidence from which the jury could conclude that Pfizer failed to establish that it would have made the same decision absent her disability or request for accommodation.

A.    *Arnold Presented Substantial Evidence to Support the Jury's Findings That She Is a Qualified Individual with a Disability*

1.    *Arnold presented substantial evidence that she could perform the essential job function of driving*

Pfizer argues that Arnold was not a qualified individual with a disability because it prohibits employees from driving while using medications that could impair their ability to drive pursuant to Fleet Safety Policy. According to Pfizer, because Arnold could not meet this essential job function, she was not a "qualified individual" under the ADA or its state law equivalent. Pfizer relies on *Jarvela v. Crete Carrier Corp.*, 754 F.3d 1283, 1285 (11th Cir. 2014), and *Zizzo v. Jewel Food Stores, Inc.*, No. 13 C 2408, 2014 WL 5858363 (N.D. Ill. Nov. 12, 2014), for its contention that compliance with company driving policies are essential job functions.

*Jarvela* and *Zizzo* are readily distinguishable. In those out-of-district cases, the employees were commercial truck drivers who were required to maintain commercial drivers' licenses

("CDLs") pursuant to Department of Transportation ("DOT") regulations, as essential functions of their jobs. *Jarvela,* 754 F.3d at 1287; *Zizzo,* 2014 WL 5858363, *5.   In *Jarvela,* the court dismissed the plaintiff's FMLA and retaliation claims because the plaintiff, who had used time off for alcohol rehabilitation treatment, could not establish that he could maintain his CDL under DOT regulations which specify that individuals with a "current clinical diagnosis of alcoholism" are not qualified to drive commercial vehicles. *See* 49 C.F.R. § 391.41(b)(13).  Similarly, in *Zizzo,* the court granted the employer's motion for summary judgment on the plaintiff's ADA claim, because the plaintiff could not establish that he could maintain his CDL under DOT regulations which state that individuals who use narcotics or other habit-forming drugs are not qualified to drive commercial vehicles. *Zizzo,* 2014 WL 5858363 at *6; *see* 49 C.F.R. § 391.41(b)(12)(i).  Also, the employer established that there were no non-CDL driving positions available that plaintiff could perform. *Zizzo,* 2014 WL 5858363 at *6.

Unlike *Jarvela* and *Zizzo,* Pfizer's Fleet Safety Policy is not equivalent to DOT commercial driver regulations that expressly mandate specific qualifications to hold a license.  Rather, as shown at trial, Pfizer's Fleet Safety Policy states that "all authorized drivers must be able to safely drive a Company Vehicle" and that medical clearance may be required for certain conditions, including "chronic use of narcotics or sedating medications."[6]  (Pfizer Trial Ex. 266, p. 1.)  Arnold presented substantial evidence at trial from which the jury could conclude that Fleet Safety Policy did not prohibit Arnold from driving while on her medications and that she instead needed medical clearance.  Therefore, the court concludes that Arnold presented ample evidence to support the jury's

---

[6] Pfizer's Fleet Safety Policy also required medical clearance for numerous other conditions, including epilepsy, vertigo, hearing loss and other cardiac conditions such as pacemakers.  (Pfizer Trial Ex. 266, p. 1.)

33 - OPINION AND ORDER ON POST-TRIAL MOTIONS

rejection of Pfizer's argument that the Fleet Safety Policy prohibited all use of sedating medications and was an essential job function.

Additionally, Arnold presented substantial evidence that she indeed provided the necessary medical clearance, and that she safely drove her company vehicle to support the jury's conclusion that she could perform the essential job function of driving. For example, Arnold's supervisor Mark Johnson testified that he rode with Arnold monthly, did not have any problems with her driving, and did not feel she was unsafe driver. (Transcript, Day 1, 191.) Pfizer physician Dr. Grossenbacher approved Arnold to return to work in June of 2007 while she was prescribed Vicodin as needed for pain. (Transcript, Day 1, 256; Day 2, 329.) And, Arnold's pain specialist, Dr. Chiu, testified that people develop tolerances to narcotics over time, and that Arnold was safe to drive. (Transcript, Day 2, 330; Day 3, 551, 576-77.) Dr. Lewis testified that she was not concerned with Arnold driving when she prescribed Vicodin. (Transcript, Day 2, 302-03.) Moreover, Arnold testified that she was not impaired while driving, that she took the medication at night and on weekends, and that if she need pain medication during the day, she went home early. (Transcript, Day 2, 331-32, 494, 501.) Mr. Arnold testified that he did not have any concerns about Arnold's driving ability. (Transcript, Day 3, 721-22.) Examining the evidence in the light most favorable to Arnold, substantial evidence supports the jury's determination that Arnold was a qualified individual with a disability who could perform the essential functions of her job. Pfizer's Rule 50(b) motion on this basis is denied.

2.    *Arnold presented evidence that she is a qualified individual with a disability because her ADD substantially limited her ability to concentrate and focus*

Pfizer maintains that there was no evidence presented at trial showing that Arnold was substantially limited in her ability to work or any other major life activity by her ADD, and therefore,

34 - OPINION AND ORDER ON POST-TRIAL MOTIONS

Arnold is not a qualified individual with a disability based on her ADD, relying on a recent Ninth Circuit case, *Weaving v. City of Hillsboro*, 763 F.3d 1106 (9th Cir. 2014). Arnold responds that Pfizer raised this issue for the first time in its Reply to its renewed JMOL. Arnold argues that Pfizer did not assert this argument as a basis for JMOL in its Rule 50(a) motion, or even in its initial briefing on its Rule 50(b) motion, or at any prior opportunity (*i.e.*, summary judgment, trial memorandum) and therefore is precluded from doing so now.

A motion under Rule 50(b) is not a stand-alone motion, but rather is a renewed motion under Rule 50(a). "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)(quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)). "However, Rule 50(b) 'may be made by an ambiguous or inartfully made motion' under Rule 50(a)." *Id.* (quoting *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989)). Absent liberal interpretation of a Rule 50(a) motion, the rule is harsh. *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

On June 13, 2014, at the close of evidence, Pfizer moved for JMOL pursuant to Rule 50(a) on the grounds that: (1) Arnold did not present sufficient clear and convincing evidence of malice to support a punitive damages claim; (2) the termination decision was made before Arnold disclosed her ADD diagnosis; (3) Arnold was not a qualified individual with a disability because she was taking sedating medications in 2008 and 2009 and was not qualified to drive; (4) Arnold was not disabled in 2008 and 2009 due to her neck and back injuries; (5) Pfizer did not know of Arnold's

PTSD diagnosis and previous leaves of absence, and could not have interfered with her FMLA leave; and (6) Pfizer had a legitimate reason for terminating Arnold – her intentional misconduct on the Starter Activity Forms and form banking. (Transcript, Day 8, 1797, 1805-06.)

Pfizer acknowledges that it did not specifically move for a new trial on the basis that Arnold's ADD did not substantially limit her ability to work or perform any other major lift activity. Pfizer contends that the court should nevertheless consider this argument because: (1) it asserted Arnold was not disabled and its new argument inherently flows from its previously asserted one; and (2) the *Weaving* case was decided on August 15, 2014, and it could not have moved on this basis earlier. (Defendant's Reply in Support of Renewed Motion for Judgment as a Matter of Law, 6 n.2 (ECF No. 283)). The court is unconvinced.

First, Pfizer makes no attempt to demonstrate where in its Rule 50(a) motion the court should infer that it argued Arnold was not substantially limited by her ADD. The court will not infer Pfizer's argument without more. Second, the *Weaving* case arose in the District of Oregon, and the Honorable Marco A. Hernandez denied a motion for summary judgment on this very issue on February 16, 2012, over *two years* before trial in this case. *Weaving v. City of Hillsboro*, Case No. 3:10-1432-HZ, 2012 WL 526425 (Feb. 16, 2012). To be sure, numerous other cases decided before *Weaving* have addressed whether a plaintiff has presented sufficient evidence that his or her ADD substantially impairs a major life activity. *See, e.g., Wright v. CompUSA, Inc.*, 352 F.3d 472, 476-77 (1st Cir. 2003); *Johnson v. Sedgwick County Sheriff's Dept.*, 461 Fed. App'x. 756, 759 (10th Cir. 2012). Thus, the timing of the *Weaving* decision does not excuse Pfizer's failure to raise this argument in its Rule 50(a) motion. Accordingly, because Pfizer did not argue that Arnold failed to present sufficient evidence to establish that her ADD substantially limited her ability to perform a

36 - OPINION AND ORDER ON POST-TRIAL MOTIONS

major life activity in its Rule 50(a) motion, Pfizer is foreclosed from asserting this argument in the instant Rule 50(b) motion. *Freund*, 347 F.3d at 761.

Alternatively, Pfizer moves for a new trial pursuant to Rule 59 on this ground. A new trial motion need not be based on grounds asserted in a Rule 50(a) motion, but instead may be based on "any reason" for which a new trial has been granted. FED. R. CIV. P. 59(a); *Freund*, 347 F.3d at 764. One of the historically recognized grounds for new trial is a challenge to the sufficiency of the evidence. *See, e.g., Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). In considering a Rule 59 motion where the party against whom a verdict has been returned challenges the evidence, the court must "'weigh the evidence as [the court] saw it and set aside a verdict, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Id.* (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)). The trial court may grant a new trial under Rule 59 only if the verdict is contrary to the clear weight of the evidence or to prevent a miscarriage of justice. *Passatino*, 212 F.3d at 510 n.15.

Pfizer argues that Arnold failed to present sufficient evidence from which the jury could conclude that Arnold's ADD substantially limited her ability to work or any other major life activity, and thus, she is not a qualified individual with a disability, relying on *Weaving*. Arnold argues that unlike *Weaving*, she did not contend that she was substantially limited in her ability to work. Instead, Arnold contends that she was substantially limited in her ability to concentrate and focus. "Concentrating" is listed as a major life activity under the ADA. 42 U.S.C. § 12102(2)(A); 29 C.F.R § 1630.2(i)(1)(i). An impairment is a disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R.

§ 1630.2(j)(1)(ii).   An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  *Id.*

In *Weaving,* plaintiff Matthew Weaving, a Hillsboro police officer, was terminated due to ongoing interpersonal conflicts with other police officers. *Weaving,* 763 F.3d at 1110.  Weaving sued, alleging disability discrimination, contending that his ADHD limited his major life activities of working and interacting with others, and that he was fired based on his ADHD.   The Ninth Circuit reversed the jury's verdict in Weaving's favor, concluding that as a matter of law, Weaving did not present sufficient evidence to show that his ability to work was substantially limited by his ADHD compared to most people in the general population. *Id.* at 1112.  The Ninth Circuit determined that Weaving was a technically competent police officer who received promotions and high-level assignments, and that the jury could not reasonably have concluded that Weaving's ADHD substantially limited his ability to work.  The *Weaving* court also rejected the plaintiff's argument that he was substantially limited in his ability to interact with others, concluding that the evidence showed only that Weaving had difficulty getting along with his peers, but suffered no difficulty getting along with supervisors or others outside of work. *Id.* at 1113.  Pfizer argues that like the police officer in *Weaving,* Arnold was able to perform her job successfully for 13 years, she was a top performer, and survived layoffs because of her stellar performance.  According to Pfizer, Arnold failed to show that she is limited in her ability to work as compared to most people in the general population, and therefore, did not establish that she has a disability, and it is entitled to a new trial.

Pfizer has not established that the jury's verdict is against the clear weight of the evidence, or that a new trial is necessary to correct a manifest injustice.  Unlike *Weaving,* Arnold presented

ample evidence from which a jury could reasonably conclude that her ADD substantially limited her major life activity of concentrating. Arnold testified that she met with Sue Lewis, M.D., to discuss her problems with concentration and focus, particularly her ability to complete tasks accurately and feeling overwhelmed. (Transcript, Day 2, 293.) Dr. Lewis testified that she examined Arnold and had Arnold complete a screening form for ADHD, and that based on Arnold's test results and her examination, Dr. Lewis diagnosed ADHD and prescribed Adderall. (Transcript, Day 2, 293-94.) Additionally, Arnold presented testimony from Allen Stark, M.D., who also testified that Arnold reported difficulty with attention and concentration, especially wrapping up final details, organizing details, avoiding complicated tasks, making careless mistakes on difficult projects, and he concurred with an ADD diagnosis. (Transcript, Day 2, 360.) Moreover, Arnold reported to Dr. Stark that she had experienced ADD symptoms prior to age 12. (Transcript, Day 1, 384.) Arnold felt her performance improved on medication. Arnold's sister, Kristi Klick, testified that Arnold had difficulty with staying focused, difficulty with memory, and that Arnold had exhibited those problems since they were children. (Transcript, Day 3, 666.) Klick testified that after Arnold's accident in 2005, Arnold's concentration became noticeably worse, stating that Arnold was "very, very disorganized, very scattered" and that it was difficult to carry on a conversation with her. (Transcript, Day 3, 667.) Klick also noted that Arnold could not stay focused for more than two minutes. (Transcript, Day 3, 667.)

Because there is evidence in the record to support the jury's verdict that Arnold was substantially limited in her major life activity of concentrating, and from which the jury could conclude that Arnold is a qualified individual with a disability under the ADA, Pfizer has failed to demonstrate that the jury's verdict is contrary to clear weight of the evidence or that a new trial is

necessary to correct a manifest injustice. Accordingly, Pfizer's motion for new trial on this basis is denied.

    B.    *Substantial Evidence Supports Jury's Conclusion That Pfizer Would Not Have Made the Same Decision Absent the Arnold's Disability or Request for Accommodation*

Pfizer contends that regardless of Arnold's disability or request for accommodation, the evidence at trial unequivocally established that it would have terminated Arnold based on her intentional misconduct with respect to SAFs. Pfizer argues that Arnold admitted to falsifications and non-compliance with the PDMA by changing dates on her SAFs, and consequently, it was not required to accommodate mistakes allegedly resulting from her ADD, and it is entitled to judgment as a matter of law. The court disagrees.

In Instruction No. 24, the court informed the jury that if "Defendant proves by a preponderance of the evidence that it would have made the same decision to terminate plaintiff," regardless of her disability or request for an accommodation, "you must find for the Defendant on Plaintiff's ADA claim." (Jury Instructions, 27 (ECF No. 262)). The jury rejected that defense. (Verdict, 2 (ECF No. 265)). In Instruction No. 27, the court also informed the jury that "[i]ntentional misconduct does not receive protection under the ADA." (Jury Instructions, 30 (ECF No. 262)). When viewing the evidence in the light most favorable to Arnold, there is more than a preponderance of evidence to support the jury's rejection of Pfizer's defense.

At trial, Arnold presented evidence from which the jury could reasonably conclude that Arnold did not engage in intentional misconduct or that Pfizer would not have made the same decision but for Arnold's disability or request for reasonable accommodation. Arnold testified that prior to Darcy Small becoming her supervisor, no prior supervisor complained that Arnold was not

following Pfizer policy by not entering SAFs on the same day physicians were sampled. (Transcript, Day 1, 229.) Arnold's husband testified that Mr. Lucherini did not require him to enter his SAFs into Sherlock on the same day he sampled doctors. (Transcript, Day 3, 714-715, 718.) Batura confirmed that SAFs for doctors who were not verified could not be entered in the Sherlock system. (Transcript, Day 5, 1098.) Mr. Arnold testified that on several instances, either he or the doctor would write down the incorrect date on the SAF form, requiring that changes be made on the SAF after the fact. (Transcript, Day 3, 716.) Ms. Rahimi testified that she has never been questioned about the manner in which she completes SAFs. (Transcript, Day 3, 685.) Arnold testified that she never lost inventory, diverted samples, or forged samples, facts confirmed by Batura. Johnson testified that he did not question the manner in which Arnold was completing the SAFs, or believe that Arnold was saving SAF forms to cover up for slow work days. (Transcript, Day 1, 179, 181.)

Additionally, there was substantial evidence that shortly after Small became Arnold's supervisor, Small became aware of Arnold's back injury. Arnold testified that during a lunch break during a meeting in February of 2009, Small inquired why she was standing during a meeting and that Small was offended by her standing. Arnold testified that she informed Small it was due to her back injury. Arnold also testified that in April 2009, at dinner with Small and Lucherini in Las Vegas, Lucherini asked Arnold about her back, and whether she would need additional surgery. Arnold testified that she informed Small and Lucherini that she would have surgery in the summer. In May 2009, Small rode along with Arnold for half the day, and asked why Arnold used a heating pad, and Arnold responded it was due to her back injury. (Transcript, Day 2, 443.) Small questioned why Arnold used SAFs from different pads, but did not suggest to Arnold that using more than one pad or using SAFs out of numerical order violated Pfizer policy. (Transcript, Day 2, 446.)

There was also substantial evidence from which the jury could conclude that after learning about Arnold's back injury and need for additional surgery, Small started questioning Arnold's work practices. Small started looking into Arnold's starter activity reports and suspected Arnold was form banking. Despite evidence that other employees, especially Rahimi, made similar mistakes, Small and Lucherini did not investigate their work practices. Batura testified that it was not against Pfizer policy to use more than one starter pad, or use SAFs out of sequential order and that it was not fraud to enter SAFs into Sherlock several days after sampling the doctor. (Transcript, Day 5, 1116-22.) Batura conceded that simply because employees entered SAFs into Sherlock later than expected did not necessarily indicate that an employee was form banking or willfully concealing work activities. (Transcript, Day 5, 1119.) Additionally, Batura was aware of other employees who delayed longer than Arnold and were not terminated, and Batura confirmed that Arnold did not divert samples or forge signatures. (Transcript, Day 5, 1125.) To be sure, Rahimi testified that she changed a date on a SAFs without obtaining the physician's signature, and that her practices had not been questioned. (Transcript, Day 3, 682, 685.) Plaintiff's expert, Michael Freeman testified that Arnold did not engage in form banking. (Transcript, Day 2, 417-18.)

Arnold also testified her mistakes on the SAFs were a result of her ADD, that she asked for help, and her request was denied. (Transcript, Day 2, 465.) Arnold testified that Dr. Nody suggested that she quit rather than return to work. Arnold also presented evidence that others committed the similar mistakes on SAFs but were not terminated.

Examining this evidence in the light most favorable to Arnold, a reasonable jury could readily conclude that Pfizer did not establish by a preponderance of evidence that it would have terminated

Arnold based on her intentional misconduct regardless of her disability or request for accommodation. Pfizer's renewed motion for JMOL on this basis is denied.

C.    *Substantial Evidence Supports Jury's Rejection of Pfizer's Affirmative Defense*

Pfizer argues that it was not required to accommodate Arnold for two reasons: (1) she was not a qualified individual with a disability, and (2) she engaged in intentional misconduct. Pfizer argues that Arnold's errors were not the product of her ADD, but instead constituted intentional misconduct that it was not required to accommodate. In support, Pfizer essentially reiterates the arguments and evidence detailed above. Nevertheless, the court has carefully considered Pfizer's arguments again and concludes that Arnold presented substantial evidence from which the jury could readily determine that Arnold was a qualified individual with a disability, and that Arnold did not engage in form banking or other intentional misconduct. Thus, there is substantial evidence in the record from which a jury could conclude that Pfizer would not have made the same decision to terminate Arnold without her disability or request for accommodation. When viewing the evidence in the light most favorable to Arnold, the court concludes that Arnold presented sufficient evidence to support the jury's finding that she did not engage in intentional misconduct. Pfizer's Rule 50(b) motion on this basis is denied.

The Court concludes, alternatively, that Pfizer has failed to establish that it is entitled to a new trial on any basis alleged in its Rule 50(b) motion.

*CONCLUSION*

Based on the foregoing reasons, Pfizer's Motion for New Trial (ECF No. 271) and Renewed Motion for Judgment as a Matter of Law (ECF No. 272) are DENIED.

IT IS SO ORDERED.

DATED this 21st day of JANUARY, 2015.

John V. Acosta
United States Magistrate Judge

44 - OPINION AND ORDER ON POST-TRIAL MOTIONS